# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TRAVEL TAGS, INC., | Civil No. 09-1619 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| UV COLOR, INC., and INTERACTIVE COMMUNICATIONS INTERNATIONAL, INC. | |
| Defendants. | |

William Z. Pentelovitch, Alain M. Baudry, and D. Scott Aberson, **MASLON EDELMAN BORMAN AND BRAND, LLP**, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402; and David R. Fairbairn, Matthew J. DeRuyter, and Stuart A. Nelson, **KINNEY & LANGE, PA**, 312 South Third Street, Minneapolis, MN 55415-1002, for plaintiff.

Lora Mitchell Friedemann, Kurt J. Niederluecke, and Laura L. Myers, **FREDRIKSON & BYRON, P.A.**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425; and Bradley W. Grout and Maya M. Eckstein, **HUNTON & WILLIAMS LLP**, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, for defendants.

On June 25, 2009, plaintiff Travel Tags, Inc. ("Travel Tags") filed this patent infringement action against defendant UV Color, Inc. ("UV Color"), alleging that packaged data cards manufactured by UV Color infringed three patents assigned to a division of Travel Tags. Later the same day, UV Color and another company, Interactive Communications International, Inc. ("InComm"), filed a declaratory judgment action against Travel Tags in the United States District Court for the Northern District of Georgia, claiming non-infringement. The case is now before the Court on Travel Tags

motion for a preliminary injunction and UV Color's motion to transfer, dismiss, or stay. For the reasons discussed below, the Court denies the motions.

While these motions were pending, United States Magistrate Judge Arthur J. Boylan granted Travel Tags' motion to amend its complaint. (Docket No. 143.) On January 13, 2010, Travel Tags filed an amended complaint, adding InComm as a defendant. (Docket No. 144.) The order that follows addresses UV Colors' motion to stay, dismiss, or transfer based on the **original** complaint, (*see* Docket No. 54), which does not name InComm as a defendant. The Court notes that UV Color and InComm filed a new motion to dismiss, transfer, or stay, (*see* Docket No. 146), after Travel Tags filed its amended complaint. The Court will address that motion in a later order, if necessary.

## BACKGROUND

Travel Tags manufactures various printed products and specializes in producing packaged data cards. (Klure Decl. ¶ 3, Docket No. 12.) Travel Tags, which is incorporated and has its principal base of business in Minnesota, makes secure packaged data cards through its Western Graphics & Data division ("Travel Tags (Western)"). (Mitton Decl. ¶¶ 3, 4, Docket No. 13.) UV Color, which is incorporated and has its principal place of business in Minnesota, also specializes in producing cards and packaging for stored-value gift cards and other prepaid products. InComm, which is not a party to this action but is presently a co-plaintiff with UV Color in a declaratory judgment action against Travel Tags in Georgia, is a major marketer and distributor of

various prepaid products, including packaged data cards manufactured by Travel Tags, UV Color, and other vendors.  (Smith Decl. ¶¶ 5, 6, 13, Docket No. 59; Graves Decl. ¶ 6, Docket No. 58.)

Travel Tags produces secured packaged data cards with account verification indicia, which it refers to as "Account Verification Packs."  (Mitton Decl. ¶ 3, 4, Docket No. 13.)  The packaged data cards consist of paper or cardboard packaging for holding data cards, typically debit or gift cards sold in a variety of retail stores such as supermarkets and department stores.  (Klure Decl. ¶ 5, Docket No. 12.)  At the point of sale, the cards are activated.  (*Id.*)  Travel Tags' Account Verification Packs are designed to provide multiple layers of security for retailers and customers: the debit or gift cards are enclosed inside a package, making it difficult for a would-be thief to remove the card without detection; the package conceals critical card information; the gift card is "correlated" to an activatable prepaid account that is not activated until the point of sale; and the card and package each have a verification number that correlates to the activatable prepaid account, which permits a party to confirm that the account associated with the package will activate the account associated with the correct card.  (Klure Decl. ¶ 8, Docket No. 12.)

The Account Verification Packs are protected by three patents, which are assigned to Travel Tags and identify the same inventor, Brian Klure: U.S. Patent Nos. 6,224,108 (the '108 Patent), 6,328,341 (the '341 Patent), and 6,439,613 (the '613 Patent)

(collectively, the "Klure Patents").[1]  (Mitton Decl. ¶ 4, Docket No. 13.)  The '108 Patent was the first filed and issued, and then the '341 Patent was filed as a continuation of the '108 Patent, and the '613 Patent was filed as a continuation of the '341 Patent.  (Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 5, Docket No. 77.)  The common features of those patents disclose (1) a package that conceals a data card's "personal identifying indicia," (2) account verification indicia on both the data card and the package that "correlate" to the same account, and (3) an aperture or opening in the package that exposes the account verification indicia on the data card.

Travel Tags alleges that UV Color produces packaged data cards that infringe the Klure Patents, and that UV Color has been selling the accused products to InComm. (Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 6, Docket No. 77.)  UV Color describes the accused products as "Wrap Products," which are essentially prepaid card products that are "encased in packaging that conceals most of the activation elements on the card until the packaging is opened."  (Def.'s Mem. in Opp'n to Mot. for Preliminary Injunction at 6, Docket No. 86.)

UV Color describes two categories of Wrap Products: "Secure Wrap Products" and "Unsecure Wrap Products."[2]  (Id.)  Secure Wrap Products can be distinguished from

---

[1] A related patent, U.S. Patent No. 6,715,795 ("the '795 Patent"), is at issue in the Georgia declaratory judgment action along with the Klure Patents.  Travel Tags, however, does not allege infringement of the '795 Patent here.

[2] Travel Tags refers to the Secure Wrap Products and Unsecure Wrap Products, respectively, as "Financial Packages" and "3rd Party Wraps."  For clarity, the Court refers to the

(Footnote continued on next page.)

Unsecure Wrap Products because they contain additional security elements required by financial services associations.  (Smith Decl. ¶ 11, Docket No. 59.)  The Secure Wrap Products are InComm-branded prepaid products that bear a Visa, MasterCard, or Discover logo and can be used at any store that accepts that brand of credit or debit card. (*Id.* ¶ 13.)  Generally, InComm itself designs Secure Wrap Products and then arranges for their production by vendors – like Travel Tags and UV Color – to distribute to large retailers like Rite-Aid, Sam's Club, and others.  (*Id.*)  In contrast, merchants or service providers design their own Unsecure Wrap Products, and then place orders for the Unsecure Wrap Products directly with InComm-certified vendors of their choice.  (*Id.* ¶ 12.)  Unsecure Wrap Products are then delivered to retailers.  (*Id.*)  InComm has certified seven vendors to produce Wrap Products for its retailer-customers.  (*Id.* ¶¶ 18-19.)  Of those seven, only four vendors – including UV Color and Travel Tags – are certified to produce Secure Wrap Products.   (Def.'s Mem. in Opp'n to Mot. for Preliminary Injunction at 8, Docket No. 86.)

On June 25, 2009, Travel Tags filed this patent infringement action against UV Color in the United States District Court for the District of Minnesota.  On the same day, InComm and UV Color filed a declaratory judgment action against Travel Tags in the Northern District of Georgia, alleging non-infringement of the patents-in-suit and an additional patent.

_____

(Footnote continued.)

two categories of Wrap Products throughout this Order as either Secure Wrap Products or Unsecure Wrap Products.

Travel Tags filed a motion to immediately enjoin UV Color from making, using, offering to sell, and selling packaged data cards that fall within the claims of the patents-in-suit.  Travel Tags has narrowed that equitable request to enjoin UV Color from accepting or filling **new** orders for the accused products.  UV Color moved to transfer the case to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a) or, in the alternative, to stay or dismiss the case pending the outcome of the Georgia action.  The Court first addresses UV Color's motion to transfer, dismiss, or stay, and then turns to Travel Tags' motion for a preliminary injunction.

## DISCUSSION

## I.  UV COLOR'S MOTION TO TRANSFER, DISMISS, OR STAY

UV Color moves to dismiss or transfer the present action to the Northern District of Georgia, or in the alternative, to stay the case pending the resolution of litigation in Georgia.  UV Color's motion, however, focuses primarily on a transfer analysis under 28 U.S.C. § 1404(a).  For the reasons set forth below, the Court concludes that transfer is inappropriate and denies UV Color's motion to dismiss, transfer, or stay.

### A.  Standard of Review for Motion to Transfer Under § 1404(a)

Transfer under 28 U.S.C. § 1404(a) is intended to "prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks omitted).  When deciding a motion to transfer, the Court considers (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the

interests of justice.  *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997).  The moving party must show that the balance of these factors "strongly favors" transfer.  *Brockman v. Sun Valley Resorts, Inc.*, 923 F. Supp. 1176, 1179 (D. Minn. 1996).  Courts are not limited, however, to consideration of those enumerated factors. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) ("A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of case-specific factors.").  Ultimately, the decision to transfer a case is committed to the discretion of the district court.  *Terra Int'l*, 119 F.3d at 691.

The parties do not dispute that this case could have been brought in the Northern District of Georgia.  *See* 28 U.S.C. § 1404(a) (permitting the Court to transfer a case "to any other district or division where it might have been brought.").  Thus, the Court turns to whether the balance of factors favors transfer to that district.

### B.    The Factors Under § 1404(a) Weigh Against Transfer

### 1.    The Convenience of the Parties Does Not Favor Transfer

In considering the convenience of the parties, § 1404(a) permits transfer to a more convenient forum, not to a forum likely to prove inconvenient or equally convenient.  *See Nelson v. Soo Line R.R. Co.*, 58 F. Supp. 2d 1023, 1027 (D. Minn. 1999).

UV Color devotes significant time in its brief arguing that the appropriate defendant in this action is InComm, not UV Color.  As a consequence, UV Color asserts that InComm's role regarding the accused products should be afforded significant weight in the transfer analysis.  Although InComm's activities – and its relationship with UV

Color – may be relevant to the instant action, InComm is not a party to the instant action. Accordingly, InComm's location, principal place of business, and involvement is not probative when considering the convenience of the parties.

UV Color also contends that all of the parties' key witnesses live outside of Minnesota. Both Travel Tags and UV Color, however, are Minnesota corporations and have their principal place of business in Minnesota. Both parties concede that some party witnesses and employees, including UV Color's CEO, must travel from Oregon or Nevada in order to participate in the proceedings. Transferring the case to the Northern District of Georgia, however, would not change the fact that some of the party witnesses will have to travel. Indeed, they would have to travel farther if the case is transferred to Georgia than if the parties litigate this matter in Minnesota. Further, transfer would make it **less** convenient for the parties, as the corporate party witnesses involved in the day-to-day operations of the companies will be required to travel from Minnesota to Georgia for the litigation. Accordingly, the convenience of the parties weighs against transfer.

### 2.      Convenience of the Witnesses

When assessing the convenience of the witnesses, the Court considers the number of essential non-party witnesses, those witnesses' locations, and the Court's preference for live testimony over depositions. *Advanced Logistics Consulting, Inc. v. C. Enyeart LLC*, Civ. No. 09-720, 2009 WL 1684428, at *5 (D. Minn. June 16, 2009); *see also Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc.*, 594 F. Supp. 731, 734 (D. Minn. 1984). Although the location of non-party witnesses plays a critical role in this

determination, *Coast-to-Coast*, 594 F. Supp. at 734-35, "[s]heer numbers of witnesses will not decide which way the convenience factor tips." *Terra Int'l*, 119 F.3d at 696 (internal quotation marks omitted). The convenience of the witnesses is an important consideration in the transfer analysis, "as it determines the relative ease of access to sources of proof." *See Nelson v. Master Lease Corp.*, 759 F. Supp. 1397, 1402 (D. Minn. 1991) (internal quotation marks omitted).

UV Color asserts that the Federal Circuit has emphasized the importance of the convenience of non-party witnesses, citing two cases in which the Federal Circuit granted writs of mandamus ordering district courts in the Eastern District of Texas to transfer cases to other districts to accommodate non-party witnesses. *See In re Genentech, Inc.*, 566 F.3d 1338, 1344 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008). UV Color argues that most of the key non-party witnesses in this case are InComm employees who reside in Georgia and are outside of this Court's subpoena power. According to UV Color, those witnesses include InComm's Vice President for Production & Innovation, InComm's Director of Intellectual Property, and InComm's Executive Vice President. UV Color argues that few, if any, key non-party witnesses reside in Minnesota.

UV Color's cited cases are not persuasive. Both *Genentech* and *TS Tech* are patent infringement cases in which plaintiff-patentees originally brought actions in the Eastern District of Texas. In *Genentech*, the Federal Circuit concluded that the district court erred in denying a motion to transfer because it failed to afford considerable weight to the convenience of the witnesses, because "a substantial number of material witnesses

reside within the transferee venue and the state of California, and no witnesses reside within the Eastern District of Texas." *In re Genentech*, 566 F.3d at 1345. Similarly, the Federal Circuit held in *TS Tech* that where all identified key witnesses were located in Ohio, Michigan, and Canada, and "because the identified witnesses would need to travel a significantly further distance from home to attend trial in Texas than Ohio, the district court's refusal to considerably weigh this factor in favor of transfer was erroneous." *In re TS Tech*, 551 F.3d at 1320.

The instant case is dissimilar. In *Genentech* and *TS Tech*, the plaintiffs did not identify non-party witnesses who resided in the Eastern District of Texas, and there was no indication that there was evidence critical to the infringement claims in that district. *See In re Genentech*, 566 F.3d at 1343; *In re TS Tech*, 551 F.3d at 1320-21. In contrast, Travel Tags has identified over fourteen party and non-party witnesses that either likely reside in this district or have a significant work connection to this district.

In analyzing the convenience of the witnesses, the Court may consider the location of both party and non-party witnesses. *See Caddy Prods., Inc. v. Seating Concepts, LLC*, Civ. No. 05-1231, 2006 WL 1085144, at *3 (D. Minn. Apr. 24, 2006); *see also Graff v. Qwest Commc'ns Corp.*, 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999). Travel Tags submits a chart with a description of primarily party witnesses who reside in Minnesota or have connections to the state through Travel Tags and UV Color. Travel Tags also indicates that non-party witnesses – such as the attorneys who prosecuted the Klure Patents – are located in Oregon. In addition, Travel Tags argues that the InComm

witnesses identified by UV Color are not essential because they would have no information about whether UV Color infringed the patents.

Here, the convenience of the witnesses weighs against transfer.  The Court notes that it is primarily concerned with the availability of non-party witnesses, *Advanced Logistics*, 2009 WL 1684428, at *5, and Travel Tags has failed to identify with specificity many essential non-party witnesses.  It appears, however, that the majority of *all* potential witnesses either reside in Minnesota or reside in states in which Georgia would be a less convenient venue.  Further, although InComm's activities may play some role in the instant litigation, it is unclear how "essential" the testimony of its employees will be in the litigation.[3]  Accordingly, the convenience of the witnesses factor is at best neutral to transfer.

### 3.       The Interests of Justice

The interest of justice factor is weighed heavily when considering a motion under § 1404(a).  *Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*, 931 F. Supp. 638, 641 (D. Minn. 1996).  In determining whether the interest of justice warrants transfer, the Court considers "the relative familiarity of the two courts with the law to be applied, the relative ability of the parties to bear the expenses of litigating in a distant forum, judicial

---

[3] The Court also may consider the location of and accessibility to records and documents pertaining to the litigation.  *Terra Int'l*, 119 F.3d at 696.  UV Color contends that the majority of the documents relating to infringement are in Georgia at InComm's headquarters, but given the ease of access to critical evidence through technology, the physical location of those documents is not integral to this analysis.  *See, e.g., CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 410 (D. Minn. 2009).

economy, the plaintiff's choice of forum, obstacles to a fair trial, and each party's ability to enforce a judgment."  *Graff*, 33 F. Supp. 2d. at 1122; *see also Terra Int'l*, 119 F.3d at 696.

### a.    Travel Tags' Choice of Forum

Generally, courts give a plaintiff's choice of forum "considerable deference" in the transfer analysis, *Terra Int'l*, 119 F.3d at 695, but they give that choice "significantly less deference" where "the underlying events giving rise to the litigation did not occur in the forum."  *CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 408 (D. Minn. 2009) (internal quotation marks omitted).  UV Color asserts that Travel Tags' choice of forum is entitled to little deference because the underlying events giving rise to this infringement action occurred in Georgia.  *See Soo Line R.R.*, 58 F. Supp. 2d at 1026.  That is, UV Color argues that InComm contracted with customers to make, market, and distribute the accused products in Georgia, and the technology behind the products for activation and service was developed in Georgia.

Again, InComm's activities have some relevance to UV Color's alleged infringement, but InComm's marketing and distribution activities, alone, do not tip the balance in favor of transfer where UV Color manufactured the accused products in Minnesota.  InComm's activities may also be relevant to the question of where the events giving rise to this action occurred, but even UV Color concedes that the **actual production and manufacture** of the accused products occurs in UV Color facilities in Minnesota.  Thus some of the events underlying this action occurred within Minnesota.

Further, courts in this District have repeatedly found that deference to the plaintiff's choice of forum is appropriate where the plaintiff resides in the chosen forum. *See Graff*, 33 F. Supp. 2d at 1121 (noting that there is a "normal presumption in favor of a plaintiff's choice of forums," particularly when the "plaintiff resides in the district in which the lawsuit was filed" (internal quotation marks omitted)); *Advanced Logistics*, 2009 WL 1684428, at *6. Travel Tags is incorporated and principally based in Minnesota, and Travel Tags' forum selection is thus entitled to a greater level of deference.

### b. Other Considerations in the Interest of Justice

UV Color argues that transfer would serve the interests of justice because the Georgia action addresses the same issues as the instant action, "but includes **all** the relevant parties . . . as well as an additional patent not asserted in this case." (Def.'s Mem. in Supp. of Mot. to Dismiss at 15, Docket No. 56.) UV Color also contends that Travel Tags deliberately failed to bring this action against InComm because it sought to earn InComm's business by bringing suit against UV Color. (*Id.* at 16.) UV Color urges the Court to recognize Travel Tags' attempt to "muddy the waters of transfer." (*Id.*)

As discussed *supra*, UV Color's first argument is unpersuasive. Travel Tags brought this action against the manufacturer of the accused products, and there is no indication that InComm **necessarily** should have also been named in the Minnesota complaint. The fact that InComm independently sought declaratory relief in Georgia that

it and UV Color did not infringe Travel Tags' patents[4] – and the fact that an additional patent is at issue in that action – is irrelevant to this analysis.   UV Color, the manufacturer, is an appropriate defendant in this case and there is no requirement that Travel Tags sue additional parties.

UV Color's second argument is also unpersuasive.   As an initial matter, UV Color's logic is confusing.   UV Color contends that Travel Tags brought this action only against UV Color, and not InComm, in an attempt to secure business from InComm that was previously offered to UV Color.   (Def.'s Mem. in Supp. of Mot. to Dismiss at 16, Docket No. 56.)   UV Color then goes on to contend that "[p]laintiffs who have tried this tactic before in an effort to muddy the waters of transfer . . . have not fared well[.]"   (*Id.*) Regardless of whether Travel Tags sought to achieve any tactical advantage from suing only UV Color – a conclusion the Court does not make – it is at least clear that Travel Tags did not omit InComm in an effort to "muddy the waters of transfer."

UV Color relies on *CSI Technology, Inc. v. Commtest Instruments Ltd.* No. 08-450, 2008 WL 4057546 (D. Minn. Aug. 26, 2008), to argue that Travel Tags omitted

---

[4] The parties also dispute whether the first-filed rule should apply here.  The first-filed rule provides that "when parallel litigation has been instituted in separate courts," priority is given to "the party who first establishes jurisdiction."  *Keymer v. Mgmt. Recruiters Int'l, Inc.,* 169 F.3d 501, 503 n.2 (8th Cir. 1999).  Pursuant to that rule, "the first court in which jurisdiction attaches" has discretion to dismiss a later-filed action or transfer the action if it involves the same parties and issues.  *Anheuser-Busch, Inc. v. Supreme Int'l Corp.,* 167 F.3d 417, 419 & n.3 (8th Cir. 1999).  "[M]ore recent case law suggests that the Federal Circuit now rejects any categorical rule that the first-filed court is always the appropriate court to determine which case should proceed in the context of patent infringement suits."  *Sanofi-Aventis Deutschland GMBH v. Novo Nordisk, Inc.,* 614 F. Supp. 2d 772, 775 (E.D. Tex. 2009).  The Court need not ultimately conclude whether the first-filed rule applies in this instance in light of the fact that this action was, indeed, filed prior to the Georgia action, and that regardless the § 1404(a) factors weigh against transfer.

InComm from the complaint to justify venue in Minnesota.  In *CSI Technology*, the plaintiff, CSI, sued defendants Commtest and 24/7 Power for patent infringement in the District of Minnesota.  *Id.* at *1.  CSI was a Delaware corporation and had its principal place of business in Delaware, but was also a wholly owned subsidiary of a Tennessee company with its principal place of business in Knoxville, Tennessee.  *Id.*  Commtest, a New Zealand company with U.S. operations in Tennessee, manufactured the allegedly infringing products.  *Id.*  24/7 Power, which was a Minnesota corporation with its principal place of business in Minnesota, distributed the accused products manufactured by Commtest.  *Id.*  Commtest moved to transfer the case to Tennessee, and the court concluded in part that "CSI . . . named 24/7 Power as a defendant for an improper purpose: to justify venue in Minnesota."  *Id.* at *6.  The court reasoned:

> There is no obvious explanation in the record why CSI chose to name only one Commtest distributor – 24/7 Power – as a defendant when Commtest employs 23 different distributors across the United States to sell its products.  Each of those distributors would be equally as "guilty" of infringement as 24/7 Power if the claims in the Complaint were established. . . . The only reasonable conclusion, then, is that CSI added 24/7 Power as a defendant in order to muddy the transfer waters and hope to justify venue in Minnesota, since 24/7 Power is headquartered here.

*Id.* at *6 (citation omitted).

The *CSI Technology* court further noted that "[c]onfronting a similar situation, . . . [another court] concluded that the defendant's motion to transfer should be granted due (in part) to the plaintiff's **forum shopping**."  *Id.* (emphasis added).  The case before the Court is distinguishable.  Travel Tags sued the **manufacturer** of the accused products, as opposed to the distributor.  Further, there is no indication that Travel Tags is forum-

shopping.  Indeed, both Travel Tags and UV Color are incorporated and principally based in Minnesota.  In these circumstances, even if Travel Tags had included InComm in its complaint, the Court is not persuaded that transfer would be appropriate.  Accordingly, the interests of justice weigh against transfer to Georgia.[5]

In sum, the convenience of the parties and the interests of justice weigh against transfer.  Because the convenience of the witnesses is, at most, neutral, transfer to Georgia is not warranted and the Court denies UV Color's motion to transfer.  To the extent that UV Color requests in the alternative that the Court stay or dismiss the case, the Court similarly finds that UV Color's motion must be denied.

## II.  TRAVEL TAGS' MOTION FOR PRELIMINARY INJUNCTION

Travel Tags now moves the Court for a preliminary injunction enjoining UV Color from accepting and filling new orders for the accused products from third parties or from InComm.[6]  In its reply brief, Travel Tags narrowed the scope of its originally requested

---

[5] On November 19, 2009, the Honorable Thomas W. Thrash of the United States District Court for the Northern District of Georgia issued an Order deferring decision on Travel Tags' Motion to Dismiss, To Stay or To Transfer the declaratory judgment action in Georgia pending resolution of the instant motions.

[6] Travel Tags originally requested an injunction preventing

UV Color . . . and those persons in active concert or participation with them who receive actual notice of the order . . . from making, using, offering to sell, and selling packaged data card assemblies that fall within the claims of one or more of the [patents-in-suit], including packaged data card assemblies no more than colorably different from the Vanilla Visa Financial Packages and 3rd Party Wraps[.]

(Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 31, Docket No. 77.)

relief: Travel Tags no longer seeks to prevent UV Color from "fulfilling pending orders for the 2009 holiday season," and now "only seeks a preliminary injunction preventing UV Color from accepting and filling new orders from the date an injunction is ordered." (Pl.'s Reply Mem. in Supp. of Mot. for Preliminary Injunction at 1, Docket No. 95.)

### A.    Standard of Review for Motion for Preliminary Injunction

Under 35 U.S.C. § 283, the Court may grant injunctive relief "in accordance with the principles of equity to prevent the violation of any right secured by patent."  The Supreme Court recently held that analysis of a request for injunctive relief in a patent case is no different than analysis of injunctive relief in any other case.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 (2006) ("These familiar principles apply with equal force to disputes arising under the Patent Act.  As this Court has long recognized, a major departure from the long tradition of equity practice should not be lightly implied.  Nothing in the Patent Act indicates that Congress intended such a departure.  To the contrary, the Patent Act expressly provides that injunctions 'may' issue in 'accordance with the principles of equity.'" (some internal quotation marks and citations omitted)).

"[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."  *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  A decision to grant or deny a motion for a preliminary injunction "is within the sound discretion of the district court, based upon its assessment of four factors: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is

not granted; (3) the balance of hardships between the parties; and (4) the public interest."[7]

*Oakley, Inc. v. Sunglass Hut, Int'l* 316 F.3d 1331, 1338-39 (Fed. Cir. 2003) (citing *Amazon.com, Inc. v. barnesandnoble.com, inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). "[T]he district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). The Court will not grant a preliminary injunction unless a movant establishes both a likelihood of success on the merits and irreparable harm. *See Amazon.com*, 239 F.3d at 1350.

### B. Travel Tags Has Not Demonstrated Irreparable Harm

The Supreme Court has made clear that an irreparable harm analysis in patent cases is no different from the same analysis in other cases. *See eBay Inc.*, 547 U.S. at 392-93 (comparing the Patent Act and the Copyright Act and holding that "this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed").

This principle contrasts with previously established Federal Circuit law, which held that if a "moving party clearly establishe[s] the first factor[, the likelihood of success on the merits] (by making a clear showing of both validity and infringement), it [is] entitled to a rebuttable presumption of irreparable harm." *Purdue Pharma L.P. v.*

---

[7] The law of the Federal Circuit, rather than the law of the Eighth Circuit, governs the preliminary injunction analysis in patent infringement cases. *Hybritech*, 849 F.2d at 1451 n.12.

*Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001) (internal quotation marks omitted; first and third alterations in original).   Courts in this District have concluded – and this Court agrees – that in light of the Supreme Court's holding in *eBay*, district courts conducting preliminary injunction analysis in patent infringement cases no longer apply a rebuttable presumption of irreparable harm if a movant makes a clear showing of a likelihood of success on the merits. *EZ Gard Indus., Inc. v. XO Athletic Co.*, No. 07-CV-4769, 2008 WL 1827490, at *4 (D. Minn. Apr. 23, 2008) ("Plaintiff must show irreparable injury is likely absent an injunction."); *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 881 (D. Minn. 2007) ("In light of the Supreme Court's decision in *eBay*[,] . . . the Court finds that it may not presume that a patentee who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a preliminary injunction.").   Rather, a plaintiff seeking a preliminary injunction must establish, *inter alia*, that it "is likely to suffer irreparable harm in the absence of preliminary relief."   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. ___, 129 S. Ct. 365, 374 (2008).

Both the Eighth Circuit and the Federal Circuit have found that a "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."); *cf. Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) (reviewing an appeal of a district court's order denying a preliminary injunction and

holding that "a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted by the non-movant"). Here, Travel Tags must demonstrate that without injunctive relief, it is likely that it will be injured and that such injury will not be compensable by monetary damages if it prevails on the merits.[8]

Travel Tags argues that it will be irreparably harmed if the Court does not issue a preliminary injunction because: (1) UV Color's products compete directly with Travel Tags' products and UV Color's sale of the accused products is causing price erosion, which is destroying Travel Tags' profit margins; (2) Travel Tags' exclusive patent rights will expire soon and if UV Color is permitted to continue to infringe, Travel Tags' right to exclude will be permanently extinguished; (3) the Court's failure to grant a preliminary injunction would encourage others to infringe the patents-in-suit; and (4) if UV Color continues to manufacture the accused products, Travel Tags will continue to lose business on its Account Verification Packs, will have to lay off additional employees, and will not be able to hire back previously laid-off employees. (Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 25, Docket No. 77.)

The Court addresses each of Travel Tags' contentions in turn, and concludes that Travel Tags has not demonstrated that damages – should Travel Tags prevail on the merits – would be inadequate to compensate it for the alleged infringement.

---

[8] In patent infringement cases, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court." 35 U.S.C. § 284.

1.      **Direct Market Competition**

a.      **Travel Tags' Evidence Does Not Support a Finding of Irreparable Harm**

Travel Tags asserts that "[w]hen an infringing product is a direct market competitor with the patented product, irreparable harm occurs that money is simply incapable of remedying." (Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 25, Docket No. 77.) Specifically, Travel Tags contends that UV Color's manufacture of the accused products has "generated conditions that [are] destroying Travel Tags' bargaining position and goodwill with customers" and that the price erosion caused by UV Color's lower prices has cut into Travel Tags' profit margins. (*Id.*; *see also* Klure Decl. ¶¶ 15-16, Docket No. 12; Mitton Decl. ¶¶ 12, 20, Docket No. 13.)

The Federal Circuit has held that direct market competition between an infringer and a patentee may cause the patentee irreparable harm. *Bridwell*, 103 F.3d at 974-76. In *Bridwell*, the Federal Circuit explained:

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat. Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

*Id.* at 975-76. *Bridwell*, however, like the remainder of the cases cited by Travel Tags in support of its direct market competition argument, was decided before *eBay*, when a patentee was entitled to a rebuttable presumption in favor of irreparable harm if the patentee could demonstrate a reasonable likelihood of success on the merits. *Id.* at 972-

73; *see also id.* at 974 ("The presumption of irreparable harm acts as a procedural device which places the ultimate **burden of production on the question of irreparable harm onto the alleged infringer**." (internal quotation marks omitted and emphasis added)). Thus, in vacating the district court's denial of the plaintiff's motion for a preliminary injunction, the Federal Circuit determined in *Bridwell* that "neither [the defendant's] arguments nor the district court's analysis supports the court's finding that [the defendant] rebutted the presumption of irreparable harm." *Id.* at 977; *see also Purdue Pharma*, 237 F.3d at 1367-68 ("Because the district court afforded [the plaintiff] the benefit of the presumption, the burden properly was on [the defendant] to produce evidence sufficient to establish that [the plaintiff] would not be irreparably harmed[.]").

In contrast to the pre-*eBay* burden placed on alleged infringers to rebut a presumption of irreparable harm where the infringer established a reasonable likelihood of success on the merits, Travel Tags has the burden of establishing that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. ___, 129 S. Ct. at 374. Travel Tags has not met this burden. In support of its arguments, Travel Tags submits the declarations of two Travel Tags (Western) employees: Brian Klure, inventor of the patents-in-suit and account executive for a Travel Tags (Western), and Brian Mitton, general manager for Travel Tags (Western). (*See* Pl.'s Mem. in Supp. at 25, Docket No. 77.) Those declarations, however, fail to demonstrate that Travel Tags is likely to be irreparably harmed if the Court does not issue a preliminary injunction.

Travel Tags cites the Klure Declaration in support of its contention that UV Color's prices for Wrap Products have eroded Travel Tags' prices and driven down profit

margins.  For example, Klure claims that UV Color "forced Travel Tags (Western) prices to seriously drop on [Unsecure Wrap Products]," citing an instance in which Travel Tags lost business with First Data for Unsecure Wrap Products provided for Burger King. (Klure Decl. ¶ 15, Docket No. 12.)   Klure asserts that Travel Tags was awarded First Data's business in 2007, but First Data thereafter discovered that UV Color's prices were lower.  (*Id.*)  Klure asserts that "[i]n 2008, we again bid on the same job for First Data, on behalf of Burger King.  We lowered our price in 2008, but still lost the contract to UV Color."  (*Id.*)  Noticeably absent from the Klure Declaration is any assertion that Travel Tags lost business to UV Color based solely on price.  There is no indication that after Travel Tags lowered its price, UV Color offered still lower prices for Wrap Products, or that First Data considered only price when it decided to contract with UV Color.   The declaration thus neglects the possibility that product quality, other product characteristics, or other aspects of the bid – aside from price – swayed First Data.

Klure also claims:

> UV Color has forced [Travel Tags] to drop our prices for 3rd Party Wraps across the board.  In 2006, I set up a pricing sheet for 3rd Party Wraps. Based upon InComm feedback about our prices being **higher than the competition**, we lowered our prices 20%.  We were still losing jobs due to price so we lowered it an additional 15% in 2007.  Later in 2007, we had to drop our prices an additional 15%.  UV Color has forced prices downward.

(*Id.* ¶ 16 (emphasis added).)  Again, Klure's Declaration is deficient, because Klure notes only that InComm informed Travel Tags that Travel Tags' prices were higher than "the competition," which could include many of InComm's other vendors, against whom

Travel Tags has not brought patent infringement suits.  Klure assumes, without providing

support, that UV Color's prices were solely responsible for Travel Tags' price erosion.

Mitton asserts that Travel Tags was profitable in 2007 and 2008, but that Travel

Tags' profits are projected to decrease by "approximately 35%" compared to total sales

in 2008, and that Travel Tags expects to incur losses of almost $1 million in 2009.

(Mitton Decl. ¶ 12, Docket No. 13.)  Mitton also claims that "[t]he manufacture and sale

of Account Verification Packs by UV Color has had an adverse effect on orders for

Travel Tags (Western) packaged data cards and the ability of Travel Tags (Western) to

negotiate prices on work, in addition to revenues and profits."  (*Id.* ¶ 13.)  Mitton does

not directly link the decrease in profit margins to UV Color's actions.  Further, Mitton

offers only conclusory, unsupported statements that competition from UV Color affected

Travel Tags' relationships with its customers, ignoring the potential effects on Travel

Tags of other competitors that produce packaged data cards.

In short, the Klure and Mitton declarations are inadequate to satisfy Travel Tags'

burden of showing irreparable harm.  Indeed, other cases finding a threat of irreparable

harm to an infringer – many of which Travel Tags cites in its supporting briefs – offer

more substantial, objective evidence of irreparable harm.  *Cf., e.g.*, *Bridwell*, 103 F.3d at

972 (describing specifically the accused product's production volume and revenue in the

context of sales revenue for the patented product and subsequent drops in that revenue);

*Purdue Pharma*, 237 F.3d at 1368 (referencing the defendant's challenge to the plaintiff's

economics expert's testimony regarding price erosion and loss of market position).

"[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel*, 995 F.2d at 1568. The Court acknowledges that "statements that a preliminary injunction is a drastic and extraordinary remedy do not imply that it must be rare or practically unattainable, only that it is not granted as a matter of right; it must be thoroughly justified." *Bridwell*, 103 F.3d at 977. Travel Tags has not justified its request for a preliminary injunction because it has not produced adequate or probative evidence showing that it is likely that it will be irreparably harmed by direct market competition with UV Color if the Court does not issue a preliminary injunction.[9]

Similarly, Travel Tags has not shown that the threat of lost sales, which are generally quantifiable and not remediable through preliminary injunctive relief, warrants the requested relief. *See Hybritech*, 849 F.2d at 1457 (noting that the Patent Act provides for injunctive relief to "preserve the legal interests of the parties against future infringement which may have **market effects never fully compensable in money**" (emphasis added)). That is, Travel Tags has not shown that those lost sales would not be compensable by damages such as reasonable royalties, as the record does not support a

---

[9] Notably, Klure's declaration addresses Travel Tags' ability to accommodate orders for the holiday gift giving season, although Travel Tags now only requests that the Court enjoin UV Color from accepting and filling new orders from the date of entry of any injunction. (*See* Klure Decl. ¶ 17, Docket No. 12.) Klure asserts that if "UV Color . . . stop[s] improperly producing [Travel Tags] Account Verification Packs . . . . [Travel Tags] will finally get the business for our patented Account Verification Packs that UV Color should never have had in the first place." (*Id.*) That assertion seems to directly contradict Travel Tags' claim that UV Color's production of Wrap Products is destroying Travel Tags' bargaining position and goodwill with customers, as Klure states that Travel Tags will successfully earn packaged data card business – despite competition from other vendors – that UV Color would have to forfeit if the Court issues and injunction.

finding that direct competition by UV Color has or will irreparably harm Travel Tags. *Cf. EZ Gard*, 2008 WL 1827490, at *4 ("Lost sales, particularly sales lost to an infringing product, cannot be remedied by dollar damages alone.  They are **likely to have an irreparable effect on plaintiff's pricing structure and market share**." (emphasis added)).

### b.  Travel Tags' Delay in Bringing Suit Weighs Against a Finding of Irreparable Harm

The Court may consider unexplained delays when assessing irreparable harm. *Bridwell*, 103 F.3d at 974 (holding, under prior Federal Circuit law presuming irreparable harm where success on the merits was likely, that "the presumption may be rebutted by evidence that . . . movants unduly delayed in bringing suit, thereby negating the idea of irreparability"); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995).  Courts may excuse that delay – or find that the delay does not negate irreparable harm – when justified under the circumstances.  *See, e.g.*, *Bridwell*, 103 F.3d at 976.  Here, Travel Tags' delay in bringing this lawsuit weighs against a finding of irreparable harm.

UV Color asserts that Travel Tags was aware that UV Color was producing the allegedly infringing Secure and Unsecure Wrap Products in 2006, three years before Travel Tags filed the lawsuit.  UV Color further argues that the three-year delay was not justified.  (Def.'s Mem. in Opp'n to Mot. for Preliminary Injunction at 39, Docket No. 86.)  Travel Tags does not dispute that it was aware of UV Color's accused products in 2006, but claims that the delay is excusable "[b]ecause it would have been difficult for

Travel Tags to overcome public interest arguments prior to it becoming Visa-certified . . . [and] there was little point in initiating litigation until it became Visa-certified." (Pl.'s Reply Mem. in Supp. of Mot. for Preliminary Injunction at 14, Docket No. 95.) Travel Tags also asserts that it raised the infringement issue with InComm in 2009 "and attempted to work with InComm to avoid this type of conflict." (*Id.*)

Travel Tags' three-year delay in filing suit is not justified. Although Travel Tags may not have had a feasible preliminary injunctive relief argument if it had filed suit before it was InComm-certified to produce Secure Wrap Products for Visa, that argument is irrelevant to the current analysis. Travel Tags was entitled to bring the lawsuit alleging infringement of the Klure Patents by the Unsecure **and** Secure Wrap Products in 2006, as Travel Tags is not required to **practice** its patents in order to recover damages for infringement of those patents. *Cf.* 35 U.S.C. § 287.

Regardless, Travel Tags became Visa-Certified in August 2008. (Pl.'s Reply Mem. in Supp. of Mot. for Preliminary Injunction at 14, Docket No. 95.). Travel Tags asserts that orders of Account Verification Packs for the holiday season comprise a significant portion of its annual revenues. Yet Travel Tags did not file this lawsuit until June 25, 2009 – ten months later – which precluded Travel Tags from protecting its allegedly infringed products for the 2008 holiday season and, eventually, the 2009 holiday period. Those facts tend to negate any assertion of irreparable harm. Further, Travel Tags claims that it raised the issue of potential infringement only with InComm, which is not a party to this action. There is no indication that Travel Tags notified UV Color that its products infringed the Klure Patents.

"[A] showing of delay does not preclude, **as a matter of law**, a determination of irreparable harm." *Hybritech*, 849 F.2d at 1457.  Here, however, the record does not adequately support Travel Tags' direct market competition arguments, and Travel Tags' delay in filing this lawsuit tends to negate any suggestion of irreparable harm.  Although Travel Tags argues that its market position has been compromised by the production of UV Color's accused products, and that UV Color's prices have eroded packaged data card prices and led to significantly shorter profit margins, Travel Tags has not demonstrated that it is likely that such injury cannot be compensated with monetary damages in the form of an award of reasonable royalties or other costs.  Accordingly, Travel Tags has not established that it is likely to be irreparably harmed by direct market competition from UV Color.

### 2.    Other Assertions of Irreparable Harm

Travel Tags argues other bases for irreparable harm, none of which is availing.

Travel Tags contends that the Court should consider the fact that patents provide exclusive rights for a limited time.  *See Hybritech* 849 F.2d at 1456 (affirming the district court's finding that "by the time the litigation is finished, it is entirely possible that the value of the patent will be gone and that technology might well bypass it")  Specifically, Travel Tags argues that if UV Color is permitted to continue producing the accused products, Travel Tags may have very little time left to enjoy its exclusive patent rights and that the "exclusivity benefit" period will be even shorter if another form of packaged

data cards becomes popular.   (Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 27, Docket No. 77.)

The exclusivity of the Klure Patents is not dispositive.  Indeed, the Federal Circuit has made clear that the right to exclude under the patent laws, alone, does not establish irreparable harm:

> Application of a concept that **every** patentee is **always** irreparably harmed by an alleged infringer's pretrial sales would . . . disserve the patent system. In *Illinois Tool* we rejected the patentee's argument that potential lost sales alone could demonstrate "manifest irreparable harm" because acceptance of that position would require a finding of irreparable harm to every patentee, regardless of the circumstances.

*Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994) (citation and some internal quotation marks omitted) (quoting *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990)).

Moreover, the Court is not persuaded that the Klure Patents' exclusivity would be nearly "permanently" extinguished by the time this litigation is complete.  At the hearing on these motions, Travel Tags represented that the first-issued Klure Patent will expire in 2020.  The Court expects that this litigation will conclude well before that date.  Further, the contention that new technology may come along, further reducing the exclusivity benefit of the Klure Patents, is too speculative, particularly because Travel Tags does not provide support for the argument that the packaged data card market may evolve so quickly that new technology threatens to overtake the instant technology.

Travel Tags also argues that if the Court does not issue a preliminary injunction, it will signal to other companies producing packaged data cards "that Travel Tags has no

power, and that the courts have no desire, to stop infringement of the Klure Patents."
(Pl.'s Am. Mem. in Supp. of Mot. for Preliminary Injunction at 26-27, Docket No. 77.);
*see Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp. 2d 578, 586 (D. Md. 2007),
*rev'd on other grounds*, 543 F.3d 1342 (Fed. Cir. 2008).   As discussed *infra*, however,
Travel Tags has not demonstrated that it is reasonably likely to succeed on the merits.
Without such a conclusion or a finding of infringement on the merits, the denial of Travel
Tags' request does not signal anything to other potentially infringing parties, other than
that preliminary injunctive relief is not warranted in these circumstances.

Finally, Travel Tags argues that after laying off several workers due to the
economic downturn, it will be forced to lay off additional employees if UV Color
continues to infringe on Travel Tags' patents.   Travel Tags further asserts that if it had
the business that UV Color has from InComm, it would be able to retain those employees
and perhaps hire new employees.   Travel Tags' argument, however, relies on an
assumption that if UV Color did not produce InComm's Secure Wrap Products, then
InComm would turn to Travel Tags to produce them.   With several vendors in the field,
however, Travel Tags' assumption is too weak to support an irreparable harm argument,
particularly when InComm has taken an adversarial position against Travel Tags in the
Georgia litigation.

In sum, Travel Tags has not established that it will be irreparably harmed through
direct market competition or other means if the Court does not issue a preliminary
injunction.   Although that failure, alone, is sufficient to deny Travel Tags' motion in its

entirely, *see Bridwell*, 103 F.3d at 973-74, the Court provides an analysis of the other three factors below.

### C.     Travel Tags Has Not Demonstrated That It Is Reasonably Likely to Succeed on the Merits

This Court has previously noted that even a strong showing of a likelihood of success on the merits may not overcome a party's failure to demonstrate irreparable harm. *See Gen. Motors Corp. v. Harry Brown's, LLC*, 590 F. Supp. 2d 1134, 1140-41 (D. Minn. 2008), *aff'd*, 563 F.3d 312 (8th Cir. 2009).  At this stage of the litigation, Travel Tags has not demonstrated that it is reasonably likely to succeed on the merits of its infringement claims.  Indeed, the parties heavily dispute the construction of several claim terms in the Klure Patents, and the Courts finds that the infringement issues – on which neither party has necessarily demonstrated a higher likelihood of success on the merits – will be developed and resolved in claim construction hearings, through dispositive motions, and potentially by a trial on the merits.

An assessment of the likelihood of infringement, like the ultimate determination of patent infringement, requires a two-step analysis. *Oakley*, 316 F.3d at 1339.  "First, the court determines the scope and meaning of the patent claims asserted and then the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citations omitted). The first step, claim construction, is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  The second step, comparison of the claim to the accused device, is a fact

question, *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed. Cir. 1998), and requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *see Oakley*, 316 F.3d at 1339.

To demonstrate a "reasonable likelihood of success on the merits," Travel Tags must show that, in light of its burden at a trial on the merits, (1) Travel Tags will likely prove that the accused products infringe the patents-in-suit and (2) Travel Tags' infringement claim will likely withstand UV Color's challenges to the validity of those patents. *Cf. Amazon.com*, 239 F.3d at 1350-51.

### 1.      Claim Construction

In the infringement analysis, the first step requires the Court to construe the patent claims as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). In the preliminary injunction motion, the parties focus their dispute on the construction of two claim terms found in all three Klure Patents.[10] In particular, Claim 1 of the '108 Patent, Claim 1 of the '341 Patent, and Claim 1 of the '613 Patent disclose:

> **first account verification indicia** on said data card and **second account verification indicia** on said package, both different from said personal identifying indicia and both **correlated** with said account, said **first and second account verification indicia** both being visibly exposed, said first one of said faces of said debit card containing said first account verification indicia, and said panel of said package including and aperture visibly exposing said first account verification indicia.

---

[10] This discussion addresses the fundamental dispute between the parties at this stage of the litigation. The parties may more fully argue and discuss at the claim construction stage the terms that the Court reviews here and any other claim terms in the Klure Patents.

Ex. 1, U.S. Patent No. 6,224,108, col. 6, line 1 - line 9 (emphases added).

> **first account verification indicia** on said data card and **second account verification indicia** on said package, both different from said personal identifying indicia and both **correlated** with said account, said **first and second account verification indicia** both being visibly exposed, said package including an aperture visibly exposing said first account verification indicia.

Ex. 1, U.S. Patent No. 6,328,341, col. 6, lines 23-29 (emphases added).

> **first account verification indicia** on said data card and **second account verification indicia** on said package, both different from said personal identifying indicia and both **correlated** with said account, said **first and second account verification indicia** both being visibly exposed, said package including an aperture visibly exposing at least said first account verification indicia.

Ex. 1, U.S. Patent No. 6,439,613, col. 6, lines 23-29 (emphases added).

The parties dispute how the Court should construe the terms "first account verification indicia," "second account verification indicia," and "correlated."

The words of the claims define the invention and are the central focus for claim construction. *Phillips v. AHW Corp.*, 415 F.3d 1303, 1312 (Fed Cir. 2005). The words of a claim "are generally given their ordinary and customary meaning." *Id.* (internal quotation marks omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313.

A court may look to a variety of sources when construing patent claims, giving greater weight to intrinsic rather than extrinsic evidence. *Id.* at 1317. As the Federal Circuit has noted, claims are part of "a fully integrated written instrument," *Markman*, 52

F.3d at 978, which includes a specification that concludes with the claims. *Phillips*, 415

F.3d at 1315. The Federal Circuit has further noted that "[t]he descriptive part of the

specification aids in ascertaining the scope and meaning of the claims inasmuch as the

words of the claims must be based upon the description. The specification is, thus, the

primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.*, 774

F.2d 448, 452 (Fed. Cir. 1985). In construing claim terms, the Court may also consider

extrinsic evidence, which "consists of all evidence external to the patent and prosecution

history, including expert and inventor testimony, dictionaries, and learned treatises."

*Markman*, 52 F.3d at 980.

### a.       first and second account verification indicia

Travel Tags argues that the Court should construe the terms "first account

verification indicia" and "second account verification indicia" to mean "any indicia that

is correlated to an account for verifying association with that account." (Pl.'s Am. Mem.

in Supp. of Mot. for Preliminary Injunction at 18, Docket No. 77.) Travel Tags contends

that the first and second account verification indicia may be identical or different. (*Id.*)

UV Color asserts that that the term "first account verification indicia" should be

construed to mean "an indicia printed on a card and representative of a specific card

account, which can be matched with a second account verification indicia to ensure that

the correct card is packaged in the correct package." (Def.'s Mem. in Opp'n to Mot. for

Preliminary Injunction at 22, Docket No. 86.) Further, UV Color argues that the term

"second account verification indicia" should be construed to mean "an indicia identical to

the first account verification indicia printed on a package and representative of a specific card account, which can be matched with the first account verification indicia to ensure that the correct card is packaged in the correct package." (*Id.*)  In contrast to Travel Tags' proposed construction, UV Color's proposed construction requires that the first and second account verification indicia be "identical."

The Klure Patents' specifications provide some insight into the disputed claim terms.  As Travel Tags notes, the specification provides that "various indicia . . . including . . . account verification indicia, can include human readable characters or, alternatively, machine-readable indicia such as magnetic strip, bar code, etc.  **Respective indicia correlated with a particular account can be identical indicia, or different indicia, as desired**." '108 Patent, col. 2, line 61-col. 3, line 1 (emphasis added).  That language indicates that indicia, whether personal identifying indicia or account verification indicia, may be identical or different.  UV Color argues, however, that later specification language suggests that while the personal identifying indicia and account verification indicia may be different, the first and second account verification indicia must be identical:

> Also on the rear panel . . . of the package, so as to be simultaneously readable with the account verification indicia . . . exposed through the aperture . . . is further account verification . . . likewise different from the personal identifying indicia . . . and also correlated with the same prepaid account.  **The simultaneously readable account verification indicia . . . enable confirmation that the personal identifying indicia . . . on the card . . . and the activation indicia . . . on the package are both correlated with the same prepaid account.  This confirms to the manufacturer, card sponsor, and/or purchaser, as the case may be, that no mismatching of the separately manufactured card . . . and package, respectively, has occurred during the packaging process.**

Ex. 1, U.S. Patent No. 6,224,108 col. 3, lines 50-63 (emphasis added); *accord* '341 Patent, col. 3, line 58 - col. 4; '613 Patent, col. 3, line 58 - col. 4, line 4; *see also* '108 Patent at col. 4, lines 59-62 ("The account verification indicia . . . is readable simultaneously with the account verification indicia . . . on the card[.]").  According to UV Color, the account verification indicia would need to be identical in order for a purchaser, for example, to confirm that the card and the package – which contains the activation indicia – "correlate" to the same account.  UV Color asserts that its expert's opinion and the figures in the patents support its interpretation.

Although the specification states that all indicia, including the personal identifying indicia, may be different, UV Color points to language in the specification strongly suggesting that the first and second account verification indicia would have to be identical characters or numbers so that a purchaser or retailer could confirm that the package and card were "correlated" to the same account.  Under these circumstances and at the preliminary injunction stage, the Court cannot find that Travel Tags is reasonably likely to succeed on the merits of its claim construction of the term "account verification indicia," given the contradictory language in the specification, and the lack of clear definition in the claims.

### b.    "correlated"

Travel Tags contends that the claim term "correlated" should be construed to mean "associated," arguing that the terms are used "interchangeably" in the Klure Patents and in prior art.  (Pl.'s Am Mem. in Supp. of Mot. for Preliminary Injunction at 20-21,

Docket No. 77; Pl.'s Reply Mem. in Supp. of Mot. for Preliminary Injunction at 4, Docket No. 95.)  UV Color disagrees, asserting that the term "correlated" – as construed by its own expert – means "a linear relationship between two or more variables such that changes in the value of one variable are accompanied by corresponding changes in the other."  (Def.'s Mem. in Opp'n to Mot. for Preliminary Injunction at 22, Docket No. 86 (internal quotation marks omitted).)

UV Color supports its argument with the testimony of its expert, Dr. Jack Grimes, and with extrinsic evidence.  Dr. Grimes asserts that the term "correlate" derives from the field of statistics, and refers to a type of relationship between two variables.  Further, UV Color contends that the dictionary supports this construction, defining "correlation" as "the state or relation of being correlated; *specif*: a relation between existing phenomena or things or between mathematical or statistical variables which tend to vary, be associated together in a way not expected on the basis of chance alone."  (Grimes Decl. ¶ 38, Docket No. 87 (citing Webster's Ninth New Collegiate Dictionary 293 (1990)).) UV Color argues that regardless, Travel Tags' proposed construction relies on an "ambiguous" sentence that does not clearly support its argument.

"[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of invention."  *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003) (per curiam).  Here, the Klure Patents do not define the term "correlated."  However, UV Color's proposed construction is not persuasive.  It is unclear how the field of statistics is relevant to the packaged data card business and the art at issue here.  Indeed, at this stage of the litigation, it appears to the Court that UV

Color's proposed construction would render the Klure Patent claims confusing, if not unintelligible.   Further, although the Court may consider a dictionary definition as extrinsic evidence to construe the claim term, the Court gives extrinsic evidence significantly less weight than intrinsic evidence.   Moreover, Dr. Grimes cites only one definition for the term "correlation," ignoring other possible definitions in favor of the definition supporting UV Color's proposed construction.

Although UV Color's proposed construction appears to lack merit, the Court finds that the Klure Patents do not clearly define the term "correlate."   Further, given the arguments and the record before it, the Court cannot now conclude that the claim term should be construed to mean "associated," which may be broader than "correlated."

Thus, the Court finds that Travel Tags has not demonstrated that it is reasonably likely to succeed on the merits of its infringement claims, in large part because it has not demonstrated that it is reasonably likely to succeed in establishing its proposed construction of critical claim terms.   Further, the parties' arguments about infringement and non-infringement are based primarily on their different proposed constructions of claim terms.   As a consequence, the Court finds that the record before it is insufficient to conclude that Travel Tags is likely to succeed on the merits of its infringement claims.[11]

---

[11] The parties also extensively discuss the validity of the Klure Patents.  Because the Court finds here, however, that Travel Tags has not demonstrated that it is reasonably likely to succeed on its infringement claims, the Court declines to address validity here.

**D.    The Balance of Harms Weighs Against Granting Preliminary Injunctive Relief**

When deciding to grant or deny injunctive relief, courts consider whether the harm to the defendant from granting an injunction outweighs the harm to the plaintiff from denying the injunction.  *Hybritech*, 849 F.2d at 1457-58.  Travel Tags contends that an injunction will not prevent UV Color from producing other, non-infringing data cards and that UV Color was aware of the patents-in-suit prior to producing the accused products. *See Decade Indus. v. Wood Tech., Inc.*, 100 F. Supp. 2d 979, 983 (D. Minn. 2000). Those factors, according to Travel Tags, tip the balance of harms in favor of injunctive relief.  UV Color responds that if the injunction issues and UV Color prevails on the merits, UV Color will have no legal remedy available to compensate it for losses caused by entry of the injunction, an estimated $25 million over the next two years.

Because the Court concludes that Travel Tags has adequate legal remedies available should it succeed on the merits, and because Travel Tags has not demonstrated a likelihood of success on the merits, the Court weighs heavily UV Color's concerns regarding the lack of legal remedy available to it if UV Color succeeds on the merits. Moreover, Travel Tags has not represented that it is willing to or able to post a bond as security for the preliminary injunction as required under Federal Rule of Civil Procedure 65(c).  As a consequence, the Court finds that the harm to UV Color if the Court issues the injunctive relief outweighs any harm to Travel Tags should the Court deny injunctive relief.

### E.    Public Policy Weighs Against Granting Preliminary Injunctive Relief

Travel Tags contends that public policy favors protection of valid patents. *See Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983). UV Color responds that although the public has a strong interest in protecting patent rights, it has a similarly strong interest in competitive markets. *See Ill. Tool Works*, 906 F.2d at 684. UV Color contends that such public interest is even stronger where Travel Tags has failed to demonstrate a likelihood of success on the merits. *See H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987), *abrogated on other grounds by Markman*, 52 F.3d at 977-78 (holding that stifling competition through enforcement of invalid or non-infringed patents defeats the public's interest in protecting valid, infringed patents). Finally, UV Color notes that because of its position in the market and relationship with InComm, an injunction would cause significant harm to retailers like Wal-Mart and its customers because UV Color would be enjoined from providing retailers with inventory.

In these circumstances, the denial of injunctive relief ensures that the flow of Wrap Products into the market will continue, and large retailers (and ultimately customers) will not suffer the consequences of an injunction. Accordingly, the public interest supports denial of Travel Tags' motion.

In sum, Travel Tags has not demonstrated irreparable harm or the likelihood of success on the merits of their patent infringement claims against UV Color. Further, because the balance of harms and the public interest weigh against granting Travel Tags' requested after relief, the Court denies Travel Tags' motion for a preliminary injunction.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant UV Color Inc.'s Motion to Stay, Dismiss or Transfer [Docket No. 54] is **DENIED**.

2.     Plaintiff's Motion for Preliminary Injunction [Docket No. 8] is **DENIED**.


DATED:  February 2, 2010                         ____s/ John H. Tunheim____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                    United States District Judge