## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TRAVEL TAGS, INC., | Civil Action No. 09-CV-1619 (JRT/AJB) |
| Plaintiff, | |
| v. | **PLAINTIFF TRAVEL TAGS'S CLAIM CONSTRUCTION BRIEF** |
| UV COLOR, INC., and INTERACTIVE COMMUNICATIONS INTERNATIONAL, INC., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Travel Tags, Inc. ("Travel Tags") submits this opening brief in support of its proposed claim construction for seven terms that appear in four related patents: United States Patent Nos. 6,224,108 ("Klure '108"), 6,328,341 ("Klure '341"), 6,439,613 ("Klure '613"), and 6,715,795 ("Klure '795") (collectively "the Klure Patents"). (Third Nelson Decl., Exs. A-D.)  Travel Tags's proposed claim construction is based on intrinsic evidence, primarily the claim language and the patent specification.  Travel Tags relies on expert and other extrinsic evidence only to confirm what the intrinsic evidence already shows.

**RELEVANT FACTS**

## I.      THE KLURE PATENTS

This case involves four patents that protect technology used in packaged data cards.  Packaged data cards, such as gift and phone cards, are commonly sold at supermarkets, department stores and other retail outlets.  (Docket 12, First Klure Declaration, ¶5.)  Travel Tags makes packaged data cards using technology that Brian Klure, a Travel Tags employee, invented and patented.  (Docket 13, First Mitton Declaration, ¶4.)

Before Brian Klure's invention, packaged data cards generally were designed with a data card (such as a gift card or phone card) attached to a thick paper carrier, with a portion of the data card extending below the bottom edge of the carrier.  (Docket 12, Klure Decl., ¶5; s*ee also* Docket 25, Fiala, et al., U.S. Pat. No. 5,918,909, FIG. 1.)  A would-be thief could access critical information associated with the data card's account and use that information to steal money from the account after the card was activated. (Docket 12, Klure Decl., ¶7.)

There was a need for a better-designed package to conceal key information on the card from would-be thieves and make the package more tamper proof.  (*Id*.)  There was also a basic quality control issue with mass production of the cards: a way to ensure that the proper card was inserted into the correct package was needed so that when a package was scanned at the point of sale, the card inside the package was actually activated, rather than some other card.  (Third Nelson Decl., Ex. B-C, Klure '341, col. 1, lines 60-62;

Klure '613, col. 1, lines 60-62; Klure '795, col. 1, lines 60-62; Docket 25, Fiala, col. 2, lines 15-19.)

Brian Klure came up with an invention for a secure package data card, which included a better package design and a quality control innovation that involved separate verification indicia on the card and package, both correlated to the same account. (Docket 12, Klure Decl., ¶¶8,11.)  This secure packaged data card is significant for several reasons.  First, the data card is enclosed inside a package, making it difficult for a would-be thief to remove the card without detection.  (*Id.*)  Second, the package conceals important information on the card from the would-be thief.  (*Id.*)  Third, the card is correlated to a specific account, which is activated at the point of sale.  (*Id.*)  Fourth, the card and the package each have separate verification indicia that correlate to the account, allowing potential verification at various stages of manufacturing and distribution that the right card had been inserted into the correct package.  (*Id.*)  Today, millions of secure package data cards are being manufactured and Brian Klure's invention, embodied in the Klure Patents, has become an industry standard.  (Docket 13, Mitton Decl., ¶¶5,8.)

Starting on March 7, 2000, Brian  Klure filed a series of patent applications to protect his invention, which eventually matured into the Klure Patents.  (Third Nelson Decl., Exs. A-D.)  Klure '795 is a continuation of Klure '613, which is a continuation of Klure '341, which is a continuation-in-part of Klure '108.  (*Id.*)  They all share the specification of Klure '108, with Klure '341, Klure '613, and Klure '795 having some additional disclosure and with each patent having different claims.  (*Id.*)  The Klure

Patents are assigned to Travel Tags and are the patents at issue in this dispute.  (Docket 13, Mitton Decl., ¶4.)

The diagram below illustrates one embodiment of the Klure '108 patent, showing each of the indicia.



*FIGS. 1 and 2 of Klure '108*

Figures 1 and 2 shows package **10** with data card **12** enclosed.[1]  Package **10** conceals personal identifying indicia **14**.  First account verification indicia **16** are on data card **12** and second account verification indicia **16a** are on package **10**.  Package **10** has an aperture **18** that visibly exposes account verification indicia **16** on data card **12**. Package **10** also has activation indicia **26**.  All of the indicia are correlated with the same account.  (Third Nelson Decl., Exs. A-D, Klure Patents.)

A.     **The Klure '108 Patent**

Independent claim 1 (bold terms are in dispute) of Klure '108 reads:

1.     *A packaged data card assembly comprising:*

---

[1] Reference characters in this paragraph refer to those of FIGS. 1 and 2, above.

> (a) at least one data card having a first substrate with opposite faces and **personal identifying indicia**, **correlated** with an activatable account, on a first one of said faces;
>
> (b) a package including at least one panel having a second substrate separate from said first substrate, said data card being detachably connected to said panel so that said **personal identifying indicia** are concealed by said panel;
>
> (c) activation indicia on said package in an exposed location, said activation indicia being **correlated** with said account so that said account is activatable by said activation indicia;
>
> (d) **first account verification indicia** on said data card and **second account verification indicia** on said package, both different from said **personal identifying indicia** and both **correlated** with said account, said **first and second account verification indicia** both being **visibly exposed**, said first one of said faces of said debit card containing said **first account verification indicia**, and said panel of said package including an aperture visibly exposing said **first account verification indicia**.

(Third Nelson Decl., Ex. A.)

## B.    The Klure '341 Patent

Independent claim 1 of Klure '341 reads:

> 1.    A data package assembly comprising:
>
> (a) at least one data card having a first substrate with opposite faces, said card having indicia **correlated** with a prepaid account;
>
> (b) a package having a second substrate separate from said first substrate, said data card being detachably connected to said second substrate;
>
> (c) **personal identifying indicia correlated** with said account and concealed by said package;
>
> (d) **first account verification indicia** on said data card and **second account verification indicia** on said package, both different from said **personal identifying indicia** and both **correlated** with said account, said **first and second account verification indicia** both being **visibly exposed**, said package including an aperture visibly exposing said **first account verification indicia**.

- 5 -

(Third Nelson Decl., Ex. B.)

### C.     The Klure '613 Patent

Independent claim 1 of Klure '613 reads:

*1.      A data package assembly comprising:*
       *(a) at least one data card having a first substrate with opposite faces, said card having indicia **correlated** with a prepaid account;*
       *(b) a package having a second substrate separate from said first substrate, said second substrate comprising at least a pair of panels folded together so as to contain said data card between said panels;*
       *(c) **personal identifying indicia correlated** with said account and concealed by said package;*
       *(d) **first account verification indicia** on said data card and **second account verification indicia** on said package, both different from said **personal identifying indicia** and both **correlated** with said account, said **first and second account verification indicia** both being **visibly exposed**, said package including an aperture visibly exposing at least said **first account verification indicia**.*

(Third Nelson Decl., Ex. C.)

### D.     The Klure '795 Patent

Independent claim 1 of Klure '795 reads:

*1. A data package assembly comprising:*
       *(a) at least one data card having a first face and an opposite second face;*
       *(b) **personal identifying indicia correlated** with a prepaid account and located on said first face;*
       *(c) **human-readable account verification indicia**, located on said first face, different from said **personal identifying indicia** and **correlated** with said account;*
       *(d) a package detachably interconnected with said data card, visibly exposing both said **account verification indicia** and at least a portion of said opposite second face of said data card while concealing said **personal identifying indicia**; and*

> *(e) said package including an aperture visibly exposing said **account verification indicia** and further including coded activation indicia different from said **account verification indicia** and said **personal identifying indicia**, said package having a pair of foldable panels, one of said panels including both said aperture and said coded activation indicia and another of said panels exposing at least a major portion of said opposite second face of said data card.*

(Third Nelson Decl., Ex. D.)

## II.   THE CLAIM LIMITATIONS AT ISSUE FOR THE *MARKMAN* HEARING

Seven claim terms are in dispute.[2]  These terms are listed in the following table, along with the proper construction for each and the section of this brief in which each element is discussed.

| Brief Section | Patent Claim Term | Claim Construction |
|---|---|---|
| A | "correlated" | Associated; linked together; put in relation with each other; connected systematically |
| B | "visibly exposed" | The account verification indicia are displayed so that they are visually discernible |
| C | "personal identifying indicia" / "personal identification indicia"[3] | Distinctive or identifying marks or indications that are personal, private, or otherwise concealed[4] |

---

[2] The parties have agreed to claim constructions for the following terms: "activatable account", "prepaid account", "indicia", "activation indicia", "coded activation indicia", and "human readable".  (*See* Docket 160, Joint Claim Construction Statement, p.2.)

[3] Claim 1 of Klure '795 originally issued with one instance of the term "personal identification indicia".  A Certificate of Correction has since issued correcting it to "personal identifying indicia".  (*See* Third Nelson Decl., Ex. D.)

[4] Travel Tags has modified this proposed construction since the Joint Claim Construction Statement so that the construction does not require the "personal identifying indicia" to be on a data card, because in claim 1 of Klure '341 and claim 1 of Klure '613, the "personal identifying indicia" are not necessarily on the data card.  Moreover, claim 4 of Klure '341 and claim 4 of Klure '613 both require the "personal identifying indicia" to be separate

| D | "account verification indicia" | Distinctive or identifying marks or indications that are correlated to an account for verifying association of a card or a package with that account |
|---|---|---|
| E | "first account verification indicia" | Distinctive or identifying marks or indications on the data card that cannot be identical to the personal identifying indicia but can be either identical to or different than the second account verification indicia. The marks or indications are displayed so that they are visually discernible and are correlated to an account for verifying association of the data card with that account. |
| F | "second account verification indicia" | Distinctive or identifying marks or indications on the package that cannot be identical to the personal identifying indicia but can be either identical to or different than the first account verification indicia. The marks or indications are displayed so that they are visually discernible and are correlated to an account for verifying association of the package with that account. |
| G | "human-readable account verification indicia" | Distinctive or identifying marks or indications that contain characters understandable to people and cannot be identical to the personal identifying indicia.  The marks or indications are on a face of the data card and are correlated to an account for verifying association of the data card with that account. |

## ARGUMENT

## I.    LEGAL STANDARD FOR CLAIM CONSTRUCTION

The purpose of claim construction is to accord the claims of a patent the meaning it would have had to a person of ordinary skill in the relevant art at the time of the invention.  *Innova/Pure Water, Inc. v. Safari Water Filtrations Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  To ascertain the meaning of a patent's claims or limitations, three

---

from the data card.  (*See* Third Nelson Decl., Ex. B-C.)  Though those dependent claims are not asserted in this action, the construction of "personal identifying indicia" should be consistent for all claims.

primary sources are to be considered: the patent's claims, its specification, and its prosecution history. *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (citation omitted), *aff'd*, 517 U.S. 370 (1996). Information from those three sources is referred to as intrinsic evidence. Extrinsic evidence, which can include testimony of how those skilled in the art would interpret the claims, may also be used in construing asserted claims. *Markman*, 52 F.3d at 979. In the process of claim construction, extrinsic evidence is less significant than intrinsic evidence for "determining the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (internal quotation omitted). Claim construction is a question of law for the Court to decide. *Markman*, 52 F.3d at 979.

### A.    Intrinsic Evidence

#### 1.    Claim Language

When reviewing the intrinsic evidence, the first step is to begin with the words of the claims. *Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003). The claims of a patent can provide "substantial guidance" in construing particular terms of an asserted claim. *Phillips*, 415 F.3d at 1314. "[T]he construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991)).

The context in which a particular term is used in the asserted claim can be highly instructive, as well as assessing similarities and differences with respect to language of other claims of the patent, whether asserted or unasserted. *Phillips*, 415 F.3d at 1314-1315.

2.    Specification

Claims must be interpreted in light of the specification of which they are a part. *Markman*, 52 F.3d at 979. Construction of a patent's claims must be consistent with a patent's internal logic, and terms can only be defined in a way that comports with the instrument as a whole. *Markman*, 517 U.S. at 389. A claim may not be interpreted in a manner which is contradicted by the patent itself. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Generally, a claim construction can only be determined and confirmed within the context of what the inventor(s) actually invented and intended to encompass with the asserted claim. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). "[T]he 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321.

The specification may dictate a particular construction of a claim term when the patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term, or when the patentee has disclaimed subject matter or otherwise limited the scope of the claims with "reasonable clarity, deliberateness and precision." *Renishaw*, 158 F.3d at 1249 (quoting *In re Paulsen*, 30 F.3d 1475, 1480

(Fed.Cir.1994)).  However, any special definition given to a word must be clearly defined in the specification.  *Markman*, 52 F.3d at 980.  A court must be careful not to read into the claim language limitations and statements from the specification that are not present in the claim language.  *Markman*, 52 F.3d at 979-80.

> 3.   Prosecution History

A patent's prosecution history also informs claim construction.  *Markman*, 52 F.3d at 980.  However, the prosecution history often lacks the clarity of the patent's specification and is therefore less useful than the specification.  *Phillips*, 415 F.3d at 1317.

## B.   Extrinsic Evidence

In order to construe claims of a patent, it is also permissible to consider extrinsic evidence, such as general and scientific dictionaries, expert testimony and technical treatises.  *Markman*, 52 F.3d at 980.  Extrinsic evidence is "less significant" and "less reliable" than intrinsic evidence.  *Phillips*, 415 F.3d at 1317-18 (citations omitted).  The use of extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *Phillips*, 415 F.3d at 1319.

Although reference to dictionaries can be helpful, their usage can be abused. "Words often have different meanings to different people and in different contexts, accounting for the multiple ordinary meanings found in dictionaries."  *Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega Systems, LLC,*

350 F.3d 1327, 1338 (Fed. Cir. 2003).  Therefore, when using a dictionary definition of a claim term, "the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor."  *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002).

Likewise, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."  *Phillips*, 415 F.3d at 1318; *see also Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) (claims should not be interpreted "on the testimony of such after-the-fact 'experts' that played no part in the creation and prosecution of the patent.")  Indeed, expert testimony construing claims should not be used by the court unless the court finds that the intrinsic evidence is insufficient to enable the court to construe the disputed claim terms, a situation that "will rarely, if ever, occur."  *Vitronics*, 90 F.3d at 1585.

## II.    PROPER    CLAIM    CONSTRUCTION    FOR    DISPUTED    CLAIM    ELEMENTS

### A.    "Correlated"

| Travel Tags's Proposed Construction | UV Color and InComm's Proposed Construction |
|---|---|
| associated; linked together; put in relation with each other; connected systematically | directly linked so that the pre-existing relationship can be confirmed at the point of sale |

The intrinsic and extrinsic evidence makes clear that the term "correlate" means "associated; linked together; put in relation with each other; connected systematically."

First, the claims of the Klure Patents, which are of primary importance, illustrate that the

term "correlated" is used in a manner consistent with Travel Tags's proposed construction

of the term.  A representative portion of those usages includes:

> at least one data card having…personal identifying indicia, **correlated** with
> an activatable account

(Third Nelson Decl., Ex. A, Klure '108, claim 1.)

> activation indicia being **correlated** with said account so that said account is
> activatable by said activation indicia

(*Id.*)

> first account verification indicia on said data card and second account
> verification indicia on said package,…both **correlated** with said account

(Third Nelson Decl., Exs. A-C, Klure '108, claim 1; Klure '341, claim 1; Klure '613,
claim 1.)

In the claims, the term "correlated" is used only for indicia being correlated to an

account.  This language illustrates that correlated claim elements are linked in some way

with a particular account.  Defendants do not dispute this proposition.

The specifications of the Klure Patents likewise support this meaning of the word

"correlated."  The specification uses "correlated" as follows:

> The rear panel 10b of the package contains activation indicia 26 in an
> exposed location, the indicia 26 preferably being a magnetically or optically
> coded strip **correlated** with the prepaid account *associated* with the
> personal identifying indicia 14 and the account verification indicia 16 on
> the rear face 12b of the card 12.

(Third Nelson Decl., Exs. A-D, Klure '108, col. 3, lines 40-45; Klure '341, col. 3, lines

47-53; Klure '613, col. 3, lines 47-53; Klure '795, col. 3, lines 47-53.)   The term

"correlated" is used in a similar manner as the term "associated," in a context that means linked together.[5]   (*See id.*; *see also* Klure '108, col. 2, lines 6-13.)   To offer further guidance, the specifications include an example of how things are correlated:

> A single company can manufacture the first card C and the package 30, secure the first card C to the package 30, and **correlate**, as, for example, by a correspondence table, the control number to the PIN P so that both numbers can be properly and uniquely associated with a metered account. Alternatively, one company can manufacture the package 30, and a second company can manufacture the first card C, then the second company or the provider of goods and services can secure the first card C to the package 30 and **correlate** the control number with the PIN P. Once the first card C is secured to the package 30 and the control number is **correlated** with the PIN P, the provider of goods or services can uniquely ***associate*** the control number and PIN P with a metered account.

(Docket 25, Fiala, col. 19, lines 9-22, *see also* col. 2, lines 15-19.)[6]

Thus, any definition of "correlated" must be consistent with associating numbers in a correspondence table with an account during manufacture and assembly.  This is not necessarily the only way things can be correlated, but it is at least one way that is contemplated by the Klure Patents.  Travel Tags's proposed construction is consistent with this usage.

---

[5] Although the Court was not prepared to conclude that "correlated" means "associated" at the time of the Court's ruling on the preliminary injunction motion (Docket 152, pp.36-38), consideration of all the intrinsic evidence demonstrates that the "correlated" is used synonymously with "associated" in the Klure Patents.

[6] Each of the Klure Patents incorporates by reference the specification of the Fiala patent. (Third Nelson Decl. Ex. A-D, Klure '108, col. 1, lines 11-13; Klure '341, col. 1, lines 16-18; Klure '613, col. 1, lines 16-18; Klure '795, col. 1, lines 18-20.)   Therefore, the specification of the Fiala patent is part of the specification of the Klure Patents and is intrinsic evidence.  *See* 37 CFR §1.57.

Extrinsic evidence also supports Travel Tags's proposed construction.   For instance, dictionary definitions, while never to be relied upon by themselves, are consistent with the usage in the Klure Patents: "…to put in relation with each other; connect systematically;…." (Docket 96-5, Webster's Third New International Dictionary (2002), p. 511); and "to establish a mutual or reciprocal relationship between…" (Docket 87-3, Webster's Ninth New Collegiate Dictionary (1990), p. 293.)

The original drafter of the Klure Patents, Jacob Vilhauer,[7] and Travel Tags's industry expert witness, Lori Breitzke,[8] likewise support Travel Tags's construction of "correlated."   (*See* Breitzke Decl., ¶¶6-8; Docket 96, Vilhauer Decl., ¶¶5-7; Third Nelson Decl., Ex. E, Vilhauer Deposition Transcript, pp.45-54.)   Vilhauer testified that the Webster's Third New International Dictionary definition of "correlate" was consistent with his own understanding of how the word "correlated" was used in the debit card security art at the time the invention was made.  (Docket 96, Vilhauer Decl., ¶6.)

Court decisions also have defined "correlated" essentially the same way as Travel Tags defines the term.  *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1363 (Fed. Cir. 2004) ("to establish a mutual or reciprocal relationship

---

[7] Jacob Vilhauer is a patent attorney with 42 years of experience.  (Docket 96-4, Vilhauer Decl., Ex. 37.)

[8] Lori Breitzke has over 20 years of experience in the industry, including work with several leading transaction gift and debit card processing companies. (Breitzke Decl., ¶¶1-4.)

between"); *Great Plains Lab. Inc. v. Metametrix Clinical Lab.*, 2006 WL 2663680 *8 (D.

Kan. 2006) ("establishing a mutual or reciprocal relation-ship [*sic*]").

One of Defendant UV Color's own patents also used "correlated" to mean

associated in a database:

> The card data 50 and/or the personal identification number 80 of each card
> in the package may be **correlated** to unique accounts in a database operated
> by an underlying supplier of goods and services. During production, the
> cards 120 may be associated with and placed in a package formed by a
> display sheet 10 and a covering 30. The card data is also *associated* in the
> database with the data from the data field 20 on the display sheet 10 with
> which the plurality of cards 40 are *associated*.

(Docket 24, Fredrickson, et al., U.S. Pat. No. 6,957,737, col. 4, lines 24-32.)  The same

correlation in tables and databases is described in other data card patents as well.  (*See*

Docket 98-1, Tejada, et al., U.S. Pat. No. 5,136,633, col. 11, lines 30-33; Docket 98-5,

Lawe, U.S. Pat. App. No. 2008/0162339 ¶51, 56-57.)

The claims do not suggest that "correlated" means "confirmed", let alone

"confirmed at the point of sale," as Defendants' suggest.[9]  Moreover, no evidence

supporting such a construction is provided in the specifications.  The term "point of sale"

never appears in the Klure Patents.  The term "confirm" does appear in the Klure Patents:

"[t]his confirms to the manufacturer, card sponsor, **and/or** purchaser, as the case may be,

that no mismatching of the separately manufactured card 12 and package, respectively,

has occurred during the packaging process."  (Third Nelson Decl., Exs. A-D, Klure '108,

---

[9] Travel Tags intends to address the flaws in Defendants' claim construction positions
more extensively in its reply brief, after having deposed their expert, Dr. Grimes.

col. 3, lines 59-63; Klure '341, col. 3, line 67 to col. 4, line 4; Klure '613, col. 3, line 67 to col. 4, line 4; Klure '795, col. 3, line 67 to col. 4, line 4.)   Thus, confirmation is certainly a potential benefit of the Klure Patents.   However, there is nothing in the specification that indicates that "confirm" is part of the definition of "correlated" or that confirmation is required at the point of sale.

The claims also do not suggest that the meaning of "correlated" requires "pre-existing relationship" prior to assembly of the package, as Defendants contend.   That phrase appears nowhere in the Klure Patents.   On the contrary, the specification of the Fiala patent, which is incorporated by the Klure Patents, gives an actual example of correlation that can occur during assembly.   (Docket 25, Fiala, col. 19, lines 9-22.)   UV Color's own patent also gives an example of correlation during assembly.   (Docket 24, Fredrickson, col. 4, lines 21-50.)   These references show that the definition of "correlated" does not require a "pre-existing relationship" to exist prior to assembly.   This is true as the term is used in the Klure Patents, and basically anywhere the term "correlated" is defined.

Similarly, the term "directly" does not appear anywhere in the Klure Patents. "Directly" does not appear in dictionary definitions of "correlated."   There is no proper purpose for including the limitation of "directly" in the definition of "correlated."   "For the patentee to use terms in a claim differently from their ordinary meaning, the special definition of the claim term must be clearly enunciated in the written description or prosecution history of the patent."   *Minnesota Mining & Manufacturing Co. v. Fellows*

*Manufacturing Co.*, 76 F. Supp. 2d 972, 977 (D. Minn. 1999).  The Klure Patents do not "clearly enunciate" a special definition for "correlated".  Thus, "correlated" should be construed as: associated; linked together; put in relation with each other; or connected systematically.

### B.  "Visibly Exposed"

| Travel Tags's Proposed Construction | UV Color and InComm's Proposed Construction |
|---|---|
| the account verification indicia are displayed so that they are visually discernible | *Ordinary and customary meaning* |

Defendants have previously asserted that "visibly exposed" encompasses exposure of *invisible* indicia, such as magnetic indicia encoded in a magnetic strip.  (*See, e.g.*, Docket 87-5, p.4.)  Thus, the parties need an actual construction of "visibly exposed" from the Court to prevent such a misinterpretation.  In the claims, the term "visibly exposed" is used only[10] as follows:

> first account verification indicia on said data card and second account verification indicia on said package, both different from said personal identifying indicia and both correlated with said account, said first and second account verification indicia both being **visibly exposed**, said package including an aperture visibly exposing said first account verification indicia

(Third Nelson Decl., Exs. A-C, Klure '108, claim 1; Klure '341, claim 1; Klure '613, claim 1.)

> first and second account verification indicia are **visibly exposed** so as to be simultaneously readable

---

[10] "Visibly exposing" also appears in the claims, and is used similarly.

(Third Nelson Decl., Ex. A, Klure '108, claim 2.)

In all instances in which the term appears in the claims, "visibly exposed" is used to modify the terms "first and second account verification indicia". Although the "account verification indicia" terms are disputed by the parties, the term "indicia" is not disputed. "Indicia" means "distinctive or identifying marks or indications." (Docket 160, Joint Claim Construction Statement, p.2.) Thus, when the claims say "visibly exposed", it means that the distinctive or identifying marks or indications are "visibly exposed".

Defendants have previously argued that "visibly exposed" includes *invisible* indicia on a magnetic strip. (*See, e.g.*, Docket 87-5, p.4.) Invisible indicia are not, however, visibly exposed. Some indicia, such as human-readable characters, are visible. You can see them. They are visually discernible. Even bar codes are visible. You can visually discern the marks of a bar code, even if you cannot understand them. The indicia stored in a magnetic strip, on the other hand, are not visibly exposed. Although the magnetic strip is, of course, visible, the actual *indicia* encoded and stored within the magnetic strip are invisible. The magnetic flux reversals are not visually discernible, they are only magnetically discernible. In fact, by looking at a magnetic strip one cannot even tell if there are any indicia encoded in the strip. It may be blank as far as one can determine, visually.

The specification of the Klure Patents is consistent with this construction. For example, indicia that one can visually see are referred to as "visibly exposed", such as: "first account verification indicia on the card, and second account verification indicia on

the package, both different from the personal identifying indicia and both correlated with the same account, are **visibly exposed**, the package including an aperture visibly exposing the first account verification indicia." (Third Nelson Decl., Ex. B-D, Klure '341, col. 2, lines 8-13; Klure '613, col. 2, lines 8-13; Klure '795, col. 2, lines 8-13; *see also* Ex. A, Klure '108, col. 3, lines 28-33; Klure '341, col. 3, lines 37-42; Klure '613, col. 3, lines 37-42; Klure '795, col. 3, lines 37-42.)   In contrast, indicia that are not visually discernible are never referred to as "visibly exposed" in the Klure Patents.  For example, the activation indicia are merely referred to as just "exposed", as in: "[t]he exposed activation indicia 26 on the package is quickly machine readable at the cash register to activate the prepaid account."  (Third Nelson Decl., Exs. A-D, Klure '108, col. 3, lines 45-47; Klure '341, col. 3, lines 53-55; Klure '613, col. 3, lines 53-55; Klure '795, col. 3, lines 53-55.)  The specifications distinguish between a data-encoded magnetic strip and numbers that are visually discernible: "[p]referably, the card 412 has indicia thereon, in the form of a data-encoded magnetic strip 413 and/or a **visually** readable number, or both, correlated with a prepaid account."  (Third Nelson Decl., Ex. B-D, Klure '341, col. 5, lines 25-28; Klure '613, col. 5, lines 25-28; Klure '795, col. 5, lines 25-28.)  Thus, the Klure Patents do not consider invisible indicia on a magnetic strip to be visibly exposed.

The drafter of the Klure Patents, Jacob Vilhauer, agrees that the indicia recorded in a magnetic strip are invisible, and consequently, not visibly exposed.  (Docket 96, Vilhauer Decl. ¶22; *see also* Third Nelson Decl., Ex. E, Vilhauer Deposition Transcript, pp.59-60.)  Defendants have identified no evidence to the contrary.  Accordingly, "visibly

exposed" should be construed to mean: the account verification indicia are displayed so that they are visually discernible.

### C.    "Personal Identifying Indicia"

| Travel Tags's Proposed Construction | UV Color and InComm's Proposed Construction |
|---|---|
| distinctive or identifying marks or indications that are personal, private, or otherwise concealed | Indefinite[11]<br>- or -<br>a string of numbers or characters used to identify a unique person who is using the account balance associated with the card to obtain goods or services.<br>The personal identifying indicia is different than the account number. |

The intrinsic evidence illustrates that "personal identifying indicia" means distinctive or identifying marks or indications that are personal, private, or otherwise concealed.  Before construing "personal identifying indicia" it should be noted that the parties have already agreed that "indicia" means: distinctive or identifying marks or indications.  Thus, the question is what the words "personal identifying" mean when read together with the word "indicia."  The claims and specification illustrate that the words "personal identifying" requires the "indicia" to be concealed or private.  In fact, in every claim of the Klure Patents, "personal identifying indicia" must be concealed by a package.  For example, two of the independent claims provide:

> **personal identifying indicia** correlated with said account and concealed by said package

---

[11] Despite repeated requests, Defendants have never clearly articulated their position on why this term is indefinite.  Resolution of this issue is currently before Magistrate Judge Boylan in a motion to compel.

(Third Nelson Decl., Exs. B-C, Klure '341, claim 1; Klure '613, claim 1.)

Additionally, the specifications of the Klure Patents give a clear description of "personal identifying indicia": "**personal identifying indicia** (e.g. a PIN number) on the card is concealed by the package." (Third Nelson Decl., Exs. A-D, Klure '108, col. 1, lines 17-18; Klure '341, col. 1, lines 22-23; Klure '613, col. 1, lines 22-23; Klure '795, col. 1, lines 24-25.)  This passage indicates that "personal identifying indicia" are private or concealed and that a PIN number is one type of "personal identifying indicia".  The specification of the Fiala patent, incorporated by reference in the Klure Patents, also describes a PIN number as private or concealed from other persons, such as a potential thief.

> "The **PIN number** P, represented schematically in FIG. 3 by a dashed rectangle portion, can comprise any sequence of the digits 0-9, for example, the six digit sequence 987654, or may additionally or instead have a sequence of characters such as the six character sequence ABCDEF. Preferably, the **PIN number** P would be a very long sequence of digits and/or characters to ensure uniqueness and to inhibit guessing of the **PIN number** by a thief who otherwise could gain unauthorized access to the funds in the metered account."

(Docket 25, Fiala, col. 5, lines 25-34.)

> "When the first card C has a **PIN number** P displayed thereon, it is desirable to obscure the **PIN number** P from view because any person knowing the **PIN number** P will have access to the metered account once the account has been activated. For example, if a thief were able to collect the **PIN numbers** for several metered accounts before purchase activation of those accounts, the thief would simply have to wait until the card and package combination was purchased by an unsuspecting purchaser and the account was activated, and then the thief could surreptitiously drain the account of its funds by using its associated **PIN** to purchase goods and services."

(Docket 25, Fiala, col. 6, lines 3-14.)

Neither the claims nor the specification ever requires "personal identifying indicia" to identify a single unique person or be different than an account number, as Defendants claim construction proposes.  Not only can a PIN be the same as an account number, in some cases the PIN actually *is* the account number.  "In some systems, the PIN is actually the account number, which corresponds to a control code that is issued with and identifies a particular phone card."  (Third Nelson Decl., Ex. F, Frazee, U.S. Pat. No. 6,829,596, col. 1, lines 30-35.)

> In a typical calling-card scenario, the VRU will prompt the calling party for an account designator, also referred to as an account number or Personal Identification Number (PIN). As used herein, **the terms "account designator," "account number," and "PIN" are used synonymously** to refer to a combination of letters, numbers, and/or symbols used to designate a particular account. It will be understood that the term "account number" is not limited to numeric digits. It will also be understood that in the telephone call processing arts, a PIN is typically a 12- or 16-digit account designator. A separate security access code also may be applied to an account to prevent unauthorized use of the account. **While such security access codes are referred to as PINs in banking and other arts, herein the term "PIN" will be used synonymously with the terms "account designator" and "account number."**

(Third Nelson Decl., Ex. G, Hopper et al., U.S. Pat. No. 6,404,866, col. 4, lines 1-16; *see also* Breitzke Decl., ¶9.)

In the claims of the Klure Patents, the term "personal identifying indicia" includes a PIN number, which can be the same as an account number, and should be construed as follows: distinctive or identifying marks or indications that are personal, private, or otherwise concealed.

D.      "Account Verification Indicia"

| Travel Tags's Proposed Construction | UV Color and InComm's Proposed Construction |
|---|---|
| distinctive or identifying marks or indications that are correlated to an account for verifying association of a card or a package with that account | an indicia printed on a card and representative of a specific card account, which can be matched to ensure that the correct card is packaged in the correct package |

The intrinsic evidence illustrates that "account verification indicia" means distinctive or identifying marks or indications that are correlated to an account for verifying association of a card or a package with that account.   In the claims, the term "account verification indicia" is used several times.   A representative portion of those usages is as follows:

> first **account verification indicia** on said data card and second **account verification indicia** on said package, both different from said personal identifying indicia and both correlated with said account, said first and second **account verification indicia** both being visibly exposed, said first one of said faces of said debit card containing said first **account verification indicia**, and said panel of said package including an aperture visibly exposing said first **account verification indicia**.

(Third Nelson Decl., Exs. A-C, Klure '108, claim 1; Klure '341 claim 1; Klure '613, claim 1.)

> human-readable **account verification indicia**, located on said first face, different from said personal identifying indicia and correlated with said account

(Third Nelson Decl., Ex. D, Klure '795, claim 1.)

In all claims, "account verification indicia" are correlated to an account.   In all claims, "account verification indicia" are visibly exposed.   In all claims, "account

verification indicia" are on a card and/or on a package.  In some claims, "account verification indicia" are on a card *and* on a package.  Claim 1 of Klure '795, however, only requires "account verification indicia" on a card.  But "account verification indicia" are not necessarily on a card.  For instance, the "second account verification indicia" are always on the package.

Defendants' position has been that the separate "account verification indicia" must be identical numbers to allow them to be directly matched.  To the contrary, the claims make clear that the "account verification indicia" need not be identical.[12]  Each of the claims literally state that some indicia must be different, but not one claim literally states that any indicia must be identical.  (*See* Third Nelson Decl., Exs. A-D, Klure '108, claim 1; Klure '341, claim 1; Klure '613 claim 1; Klure '795, claim 1.)  Moreover, Claim 1 of Klure '795 does not even require multiple instances of "account verification indicia" -- it just requires one.  Even in the claims with first and second "account verification indicia", the indicia are treated as if they may be different: "first account verification indicia on said data card and second account verification indicia on said package, **both** different from said personal identifying indicia and **both** correlated with said account."  (Third Nelson Decl., Exs. A-C, Klure '108, claim 1; Klure '341, claim 1; Klure '613 claim 1.)  The claims must specify "both" because the indicia are not necessarily identical.

---

[12] Although the Court was not prepared to conclude that the first or second account verification indicia could be the same or different at the time of the Court's ruling on the preliminary injunction motion (Docket 152, pp.34-36), consideration of all the intrinsic evidence demonstrates that the indicia do not need to be the same.

Likewise, the specifications of the Klure Patents never require account verification indicia to be matched or identical.  To the contrary, the specifications state:

> In all of the exemplary embodiments, the various indicia imaged on the respective substrates of the data card and package, including personal identifying indicia, activation indicia, and **account verification indicia**, can include human-readable characters or, alternatively, machine-readable indicia such as magnetic strip, bar code, etc. Respective indicia correlated with a particular account can be identical indicia **or different** indicia, **as desired**.

(Third Nelson Decl., Exs. A-D, Klure '108, col. 2, line 61 – col. 3, line 1; Klure '341, col. 3, lines 1-8; Klure '613, col. 3, lines 1-8; Klure '795, col. 3, lines 1-8.)  Certainly some indicia *can* be identical.  However, the words "or different" makes clear that indicia also can be different.  The phrase "as desired" shows that the choice between identical and different is just that: a choice.

The Figures of the Klure Patents lend further evidence that the "account verification indicia" can be different.  In the Figures, the first account verification indicia are identified by reference character "**16**" while the "second account verification indicia" are identified by a different reference character "**16a**".  (Third Nelson Decl., Exs. A-D, Klure Patents, FIG. 2.)  Using different reference characters to identify different parts in a patent drawing is mandatory according to long-standing patent drafting rules.  *See* 37 CFR §1.84(p)(4).

The extrinsic evidence also illustrates that "account verification indicia" need not be identical.  Jacob Vilhauer, who drafted the Klure Patents, has stated that he had no intent to require matching of identical "account verification indicia".  (Docket 96,

Vilhauer Decl. ¶¶8-12.)  Lori Breitzke also agrees that the explicit language in the Klure Patents treats the "account verification indicia" as not necessarily matched.  (Breitzke Decl., ¶¶10-12.)

Even if the specification allows for matching of indicia, there is no clear enunciation to support reading such a limitation from the specification into the claims. *See Minnesota Mining & Manufacturing Co. v. Fellows Manufacturing Co.*, 76 F. Supp. 2d 972, 977 (D. Minn. 1999); *see also Phillips*, at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (noting that the scope of a claim may include "different subject matter than is illustrated in the specific embodiments of the specification").

"Account verification indicia" can be, and are, used to verify that the correct card is in the correct package without having to match identical numbers.  The indicia simply need to be correlated to the same account, for example, in a look-up or correspondence table or database.  Such a table or database is described in the Fiala patent, which is incorporated by reference by the Klure Patents.  (Docket 25, Fiala, col. 19, lines 9-22, *see also* col. 2, lines 15-19.)

Thus, in the claims of the Klure Patents, "account verification indicia" should be construed consistent with the claims and the specifications to mean: distinctive or

identifying marks or indications that are correlated to an account for verifying association of a card or a package with that account.

### E.     "First Account Verification Indicia"

| Travel Tags's Proposed Construction | UV Color and InComm's Proposed Construction |
|---|---|
| Distinctive or identifying marks or indications on the data card that cannot be identical to the personal identifying indicia but can be either identical to or different than the second account verification indicia. The marks or indications are displayed so that they are visually discernible and are correlated to an account for verifying association of the data card with that account. | an indicia printed on a card and representative of a specific card account, which can be matched with a second account verification indicia to ensure that the correct card is packaged in the correct package |

Before construing "first account verification indicia" it should be noted that the parties have already agreed that "indicia" means: distinctive or identifying marks or indications.  If the Court has already construed the phrase "account verification indicia", that construction should also be noted.  Then the claims should be consulted.  In the claims of the Klure Patents, the term "first account verification indicia" appears only as follows:

> **first account verification indicia** on said data card and second account verification indicia on said package, both different from said personal identifying indicia and both correlated with said account, said **first** and second **account verification indicia** both being visibly exposed, said package including an aperture visibly exposing said **first account verification indicia**

(Third Nelson Decl., Exs. A-C, Klure '108, claim 1; Klure '341, claim 1; Klure '613, claim 1.)

> wherein said **first** and second **account verification indicia** are visibly exposed so as to be simultaneously readable

(Third Nelson Decl., Ex. A, Klure '108, claim 2.)

> wherein said packaged has opposite faces, one of said faces of said package visibly exposing both said **first** and second **account verification indicia**

(Third Nelson Decl., Exs. B-C, Klure '341, claim 3; Klure '613, claim 3.)

These claims illustrate that the term "first account verification indicia" has at least the same limitations as the term "account verification indicia": distinctive or identifying marks or indications that are correlated to an account for verifying association of a card or a package with that account. However, "first account verification indicia" requires more than just "account verification indicia". For example, in all claims that include the term, "first account verification indicia" are on the data card. In all claims, "first account verification indicia" must be "different from" (not identical to) the "personal identifying indicia". On the other hand, "first account verification indicia" can be either identical to or different than the "second account verification indicia", because the claims never make either a requirement. Finally, the claims teach us that "first account verification indicia" must be visibly exposed (visually discernible); the term is never used otherwise. The construction for "first account verification indicia" proposed by Travel Tags is consistent with all of these usages.

There is nothing in the claims to support a construction that "first account verification indicia" necessarily "can be matched with a second account verification indicia." On the contrary, the Klure Patents are reasonably clear that the "first account

verification indicia" "can be identical indicia **or** different indicia". (Third Nelson Decl., Exs. A-D, Klure '108, col. 2, line 67 - col. 3, line 1; Klure '341, col. 3, lines 7-8; Klure '613, col. 3, lines 7-8; Klure '795, col. 3, lines 7-8.) This is consistent with how the drafter of the Klure Patents, Jacob Vilhauer, describes the meaning of "first account verification indicia". (Docket 96, Vilhauer Decl. ¶¶8-12; *see also* Third Nelson Decl., Ex. E, Vilhauer Deposition Transcript, pp.55-56.) Travel Tags's expert, Lori Breitzke, also agrees that matching numbers is not a proper construction for "first account verification indicia". (Breitzke Decl., ¶¶10-12.)

Thus, in the claims of the Klure Patents, "first account verification indicia" should be construed as follows: distinctive or identifying marks or indications on the data card that cannot be identical to the personal identifying indicia but can be either identical to or different than the second account verification indicia. The marks or indications are displayed so that they are visually discernible and are correlated to an account for verifying association of the data card with that account.

### F.    "Second Account Verification Indicia"

| Travel Tags's Proposed Construction | UV Color and InComm's Proposed Construction |
|---|---|
| Distinctive or identifying marks or indications on the package that cannot be identical to the personal identifying indicia but can be either identical to or different than the first account verification indicia. The marks or indications are displayed so that they are visually discernible and are correlated to an account for verifying association of the package with that account. | an indicia identical to the first account verification indicia printed on a package and representative of a specific card account, which can be matched with the first account verification indicia to ensure that the correct card is packaged in the correct package |

Before construing "second account verification indicia" it should be noted that the parties have already agreed that "indicia" means: distinctive or identifying marks or indications. If the Court has already construed the phrases "account verification indicia" and "first account verification indicia", those constructions should also be noted. Then the claims should be consulted. In the claims of the Klure Patents, the term "second account verification indicia" appears only as follows:

> first account verification indicia on said data card and **second account verification indicia** on said package, both different from said personal identifying indicia and both correlated with said account, said first and **second account verification indicia** both being visibly exposed, said package including an aperture visibly exposing said first account verification indicia

(Third Nelson Decl., Exs. A-C, Klure '108, claim 1; Klure '341, claim 1; Klure '613, claim 1.)

> wherein said first and **second account verification indicia** are visibly exposed so as to be simultaneously readable

(Third Nelson Decl., Ex. A, Klure '108, claim 2.)

> wherein said packaged has opposite faces, one of said faces of said package visibly exposing both said first and **second account verification indicia**

(Third Nelson Decl., Exs. B-C, Klure '341, claim 3; Klure '613, claim 3.)

As can be seen from the claims, the term "second account verification indicia" is used in a similar manner to the term "first account verification indicia" except for two differences. First, "second account verification indicia" are separate indicia. Second,

"second account verification indicia" are on the package, while the "first account verification indicia" are on the data card.

The constructions proposed by both parties agree that these are separate indicia and that the "second account verification indicia" are on the package. Thus, the Court's construction of "second account verification indicia" will likely correspond to the construction the Court selects for "first account verification indicia". Travel Tags's construction should be adopted for the same reasons as articulated above.

Thus, in the claims of the Klure Patents, "second account verification indicia" should be construed as follows: distinctive or identifying marks or indications on the package that cannot be identical to the personal identifying indicia but can be either identical to or different than the first account verification indicia. The marks or indications are displayed so that they are visually discernible and are correlated to an account for verifying association of the package with that account.

G.    **"Human-Readable Account Verification Indicia"**

| **Travel Tags's Proposed Construction** | **UV Color and InComm's Proposed Construction** |
|---|---|
| Distinctive or identifying marks or indications that contain characters understandable to people and cannot be identical to the personal identifying indicia. The marks or indications are on a face of the data card and are correlated to an account for verifying association of the data card with that account. | *Construction not needed because parties agreed upon construction of "human readable," and "account verification indicia" is separately construed.* |

Before construing "human-readable account verification indicia" it should be noted that the parties have already agreed that "indicia" means: distinctive or identifying marks or indications.   The parties have also agreed that "human readable" means: containing characters understandable to people.   If the Court has already construed the phrase "account verification indicia", that construction should also be noted.   Then the claims should be consulted.   "Human-readable account verification indicia" appears only in claim 1 of Klure '795, the entirety of which appears as follows:

> 1. A data package assembly comprising:
>> (a) at least one data card having a first face and an opposite second face;
>> (b) personal identifying indicia correlated with a prepaid account and located on said first face;
>> (c) **human-readable account verification indicia**, located on said first face, different from said personal identifying indicia and correlated with said account;
>> (d) a package detachably interconnected with said data card, visibly exposing both **said account verification indicia** and at least a portion of said opposite second face of said data card while concealing said personal identifying indicia; and
>> (e) said package including an aperture visibly exposing **said account verification indicia** and further including coded activation indicia different from **said account verification indicia** and said personal identifying indicia, said package having a pair of foldable panels, one of said panels including both said aperture and said coded activation indicia and another of said panels exposing at least a major portion of said opposite second face of said data card.

(Third Nelson Decl., Ex. D.)

This claim illustrates that "human readable account verification indicia" are on a face of a data card.   They are different from personal identifying indicia.   They are

different from the coded activation indicia.  They are visibly exposed through an aperture in the package.

Even though "human readable" and "account verification indicia" have been separately construed, claim 1 of Klure '795 includes additional limitations as part of the complete term "human-readable account verification indicia".  Since claim 1 of Klure '795 is the only place where "human-readable account verification indicia" appears, it should be construed so as to include those additional limitations.  Thus, a proper construction should include that the indicia are on a face of the data card and that they are different from (not identical to) the personal identifying indicia.[13]

Thus, in the claims of the Klure Patents, "human-readable account verification indicia" should be construed as follows: distinctive or identifying marks or indications that contain characters understandable to people and cannot be identical to the personal identifying indicia.  The marks or indications are on a face of the data card and are correlated to an account for verifying association of the data card with that account.

## CONCLUSION

In conclusion, Travel Tags's construction is based upon the Klure Patents' claims and specifications, expert and other extrinsic evidence used only to confirm what the

---

[13] The claim also states that the "human-readable account verification indicia" is different than the "coded activation indicia".  This could also be part of the construction of "human-readable account verification indicia"; however, that requirement is already part of the construction of "coded activation indicia" agreed upon by the parties.  Thus, Travel Tags defers to the Court's discretion as to whether it would be helpful to include that clarification in the construction of "human-readable account verification indicia" as well.

intrinsic evidence has already shown.   This Court thus should adopt Travel Tags'

construction.

**Respectfully submitted,**


Dated:   __March 5, 2010__          By:      __s/ Stuart A. Nelson_____
                                          David R. Fairbairn (28,125)
                                          Stuart A. Nelson (336,075)
                                          Matthew J. DeRuyter (388,315)
                                          KINNEY & LANGE, P.A.
                                          The Kinney & Lange Building
                                          312 South Third Street
                                          Minneapolis, MN  55415-1002
                                          Email: drfairbairn@kinney.com
                                                  snelson@kinney.com
                                                  mderuyter@kinney.com
                                          Telephone:    (612) 339-1863
                                          Facsimile:     (612) 339-6580

                                               and

                                          William Z. Pentelovitch (85,078)
                                          Alain M. Baudry (186,685)
                                          D. Scott Aberson (387,143)
                                          MASLON EDELMAN BORMAN &
                                          BRAND LLP
                                          3300 Wells Fargo Center
                                          90 South Seventh Street
                                          Minneapolis, MN 55402
                                          Email:
                                          william.pentelovitch@maslon.com
                                          alain.baudry@maslon.com
                                          scott.aberson@maslon.com
                                          Telephone:    (612) 672-8200

                                          **ATTORNEYS FOR PLAINTIFF
                                          TRAVEL TAGS, INC.**